[Crim. No. 10169. Second Dist., Div. Four. Aug. 25, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. FAUSTO EDWARD FLORES, Defendant and Appellant.

Patrick J. Sampson, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and C. Anthony Collins, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged with murder in violation of section 187 of the Penal Code. He pled not guilty and, after a jury trial, he was convicted of murder in the first degree. The jury was unable to agree on the penalty and the trial court, exercising the discretion granted it by section 190.1 of the Penal Code, imposed a sentence of life imprisonment. Defendant has appealed.[1]

---

[1]The notice of appeal, filed by defendant in propria persona, is both from the judgment and from the order denying a new trial. The latter order is not appealable (Pen. Code, § 1237), and that portion of the appeal must be dismissed.

The victim, a 16-year-old girl named Socorro Palomares, left her home in the morning of August 20, 1963, purportedly on her way to work; no witness testified to seeing her again until about 7:15 a.m., on the morning of August 21st, when a park employee discovered her body lying on a slope in a remote portion of Elysian Park. She had met her death by smothering in the early evening of August 20th and she had had sexual intercourse within 24 to 36 hours before her body was discovered. She was from three to four weeks pregnant. Although an attempt had been made to make it appear that she was the victim of a rape, the condition of her body and clothing, in the uncontradicted opinion of the medical and police witnesses, rebutted that theory.

Defendant had known the victim for some time and, about two years before, had been convicted of statutory rape against her. He was on probation, under orders to support the child who was born of the earlier relation and under a prohibition against seeing the victim other than in the presence of her mother in connection with visits to the child. There was evidence that defendant, who had married another woman after his conviction, was still seeing the victim and that she had told friends that the new pregnancy was by defendant.

It was the theory of the prosecution that defendant and the victim had gone to the beach together on August 20th; that she had then threatened to tell her mother of the new pregnancy; that, fearing that this disclosure would result in revocation of his probation, defendant had driven the girl to the park shortly after dark and there smothered her, arranged her clothing to simulate a rape, and then gone home.

Defendant worked at a car washing establishment. He did not report for work on August 20th. On the morning of August 21st he reported for work but was laid off for lack of business. He asked, and received, permission to use the car wash for washing his car and did so, vacuuming the interior and performing other cleaning and polishing with the help of his fellow employees.

Defendant was arrested about noon on August 21st. He told the officers conflicting stories as to his movements on the day and evening of August 20th; in all of them he claimed to have gone to the beach that day, leaving the beach at about 7:30 p.m. His stories varied as to whether he was accompanied by a friend named "Bouncer" or by a stranger

whom he met at the beach, and as to the manner in which he spent his time after leaving the beach and prior to picking up his wife at her parent's home about 10:30 p.m. However, throughout, he denied having seen the victim on that day or knowing anything about her death.

On August 22d, the police officers arranged to have an undercover police officer placed in defendant's cell, purportedly as being under arrest for a narcotic offense. A microphone was placed in the cell and the conversation between defendant and the officer, covering about three days, was taped. Portions of this conversation were repeated to the jury as part of the prosecution's case. The Attorney General agrees that they amounted to a confession of the murder and a description of the manner in which it was accomplished. In addition, sundry objects, some corroborative of defendant's story and some incriminatory, were taken from his automobile after it had been impounded by the police and after a delay of several days, and these articles were introduced into evidence.

The case was tried in April of 1964, prior to the decisions in *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and to the decision in *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]—and, of course, long prior to the final decision in *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. Judged by the rules as they were generally understood in August of 1963, when the case was under investigation, and in April 1964, when it was tried, the conduct of the police and of the trial court was not open to question. But the cases above cited, and applicable in this court on this appeal, compel a reversal.

I

The victim's body was discovered about 7:15 a.m., on August 21st. Defendant was arrested, without a warrant, at approximately 11 a.m., on the same day. The arresting officer testified that he merely told defendant that he was under arrest, but that he did not tell him for what offense. Defendant was seated in the police car and, shortly thereafter, he volunteered the statement: "I was home last night with my wife. I watched television. I took a shower and I went to bed." Defendant was thereafter transported to the police station, where, at about 12:30 p.m., he was interrogated by

two officers, giving the first of his accounts of his activities the previous day. A second interrogation took place at about 6 p.m., at which time defendant, having in the meantime talked with his parole officer, was asked to "think it over" until the next morning. A third interrogation took place on the morning of August 22d. During this conversation, defendant told a somewhat different story both as to his relations with the victim and as to his movements during the early evening of August 20th. This third conversation was punctuated by statements by the officers to the effect that they did not believe him, and that they knew he had murdered the girl and with exhortations to "tell what really happened."

It was after this conversation that the officer in charge of the case arranged to have the undercover officer placed in defendant's cell. The undercover officer was told that the officers believed that defendant had murdered a young girl and that "we wanted him [the undercover officer] to get in the cell and act dumb and see what information he could get regarding his [defendant's] activities on that day."

## II

Since the first statement to the police was volunteered, it clearly did not violate the *Dorado* rule. Because we must reverse the conviction, under *Dorado,* by reason of the use of the confession obtained by the undercover officer, we need not consider whether or not any of the statements made to the officers in the police station interrogations were also inadmissible. If the case is retried, both the People and the defense will have an opportunity to explore the circumstances surrounding those interrogation sessions in the light of the principles expounded in *People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97] and other recent decisions.

For the same reason, we do not consider the applicability of *People* v. *Burke, supra* (1964) 61 Cal.2d 575, to the use of the articles discovered in the search of defendant's automobile, at the police station and some time after his arrest.

## III

 The conviction must be reversed because of the use against defendant of the conversation in his jail cell between him and the undercover officer. Not only was this, as the Attorney General admits, a full confession, but it was the principal basis of the People's case and the only evidence which directly connected defendant with the victim on the

day of her death.[2] We can see no grounds for distinguishing this case from *Massiah* v. *United States, supra* (1964) 377 U.S. 201, or from *Spano* v. *New York* (1959) 360 U.S. 315 [79 S.Ct. 1202, 3 L.Ed.2d 1265]. It is true that defendant here was not yet under indictment; but that factor has been held to be immaterial in *People* v. *Dorado, supra* (1965) 62 Cal.2d 338. Except for the absence of an indictment, we have here a defendant under arrest, on whom the suspicion of the police had already fastened, a process of interrogation by a police officer conducted for the express purpose of securing incriminating statements and—of course—without warning of constitutional rights. The evidence—clearly prejudicial—was illegally secured and illegally introduced.

We do not deal here with statements made by a defendant to a cellmate and testified to by the latter, as was the case in *People* v. *Teale* (1965) 63 Cal.2d 178 [45 Cal.Rptr. 729, 404 P.2d 209][3]; nor with statements secured by the police by listening in on conversations between two or more suspects, as in *People* v. *Ketchel* (1963) 59 Cal.2d 503, 519-522 [30 Cal.Rptr. 538, 381 P.2d 394], in *People* v. *Ross* (1965) *ante*, p. 364 [46 Cal.Rptr. 44], in *People* v. *Boulad* (1965) 235 Cal.App.2d 118 [45 Cal.Rptr. 104], and in *People* v. *Bazaure* (1965) 235 Cal.App.2d 21 [44 Cal.Rptr. 831]. Nor do we deal with the testimony of an undercover officer as to statements made to him in the course of commission of the crime itself, nor with statements secured by an undercover officer during the course of procedures preceding arrest. We are concerned, here, only with a case in which, after arrest, and after suspicion had definitely focused on defendant, a police officer, pretending to be a private citizen, initiated a conversation calculated (and here designed) to procure a statement from a defendant which would amount to a confession of the crime with which that defendant was later charged.[4]

[2]Defendant admitted being at the beach that day; sand of the type usually found on our beaches, was found in the seams of the victim's blouse. While this supports the theory that she, also, had gone to the beach, it, by itself, hardly proves that she had gone there with defendant.

[3]It is of some significance that, in describing the conversation between Teale and his cellmate, Mr. Justice Peek stated: "No claim is made and the record does not disclose that Teale's fellow prisoner was acting in complicity with the state." (62 Cal.2d 178, 185.)

[4]The same basic situation was involved in *In re Lopez* (1965) 62 Cal. 2d 368 [42 Cal.Rptr. 188, 398 P.2d 380], in which the Supreme Court assumed, for the purpose of the issue of retroactivity of *Dorado,* that a statement obtained by placing a stool pigeon in defendant's cell was inadmissible under the *Escobedo-Dorado* rule. (See 62 Cal.2d at p. 372, fn. 1.)

The Attorney General argues that, since the statement here was made to one thought by defendant to be a fellow prisoner, it was as voluntary as those in the cases above cited, any possible element of awe or fear of the police being absent. But the rule herein involved assumes that the statements were voluntary and thus admissible under the older rule; it is not an extension of the rule on voluntary confessions, but an additional rule, resting on other considerations spelled out in detail in *Dorado* and in the cases therein analyzed. The difference between this case and those where the statement was made to a legitimate fellow prisoner is important. In the true ''fellow prisoner'' cases, there is no ''process of interrogation'' but, rather, statements volunteered in the course of ordinary conversation. Here, however, defendant was subjected, as a reading of the transcript discloses, to a long course of skillful prodding, by a trained police officer, carefully calculated to induce him to discuss his crime and to make incriminating statements concerning his part in it.

Since the jail cell conversations were inadmissible for the reason above stated, we need not consider the argument against their admissibility based on section 825 of the Penal Code.

The judgment is reversed; the purported appeal from the order denying a new trial is dismissed.

Files, P. J., and Jefferson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 20, 1965.