[Crim. No. 11777. Second Dist., Div. Two. Aug. 10, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WOODROW
WILSON WATTIE, Defendant and Appellant.

Woodrow Wilson Wattie, in pro. per., and Gilbert F. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Bradley A. Stoutt, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J. — Defendants Benjamin Paniagua and Woodrow Wattie appealed from judgments of conviction entered after a jury found them guilty of the crime of murder. Paniagua's crime was found to be murder of the first degree and his punishment was fixed as life imprisonment. Appellant Wattie was found guilty of second degree murder and he was sentenced to imprisonment for the term prescribed by law. A codefendant, Robert Calvillo, also was found guilty of second degree murder and sentenced to prison. He has not appealed. Paniagua died during the pendency of these appeals and his appeal was dismissed on June 12, 1967.

Appellant Wattie contends that prejudicial error was committed (1) when the court admitted into evidence the statements given to the police by appellant and Calvillo following their arrest; and (2) when the court admitted the testimony of a fellow prisoner concerning statements made to him by Paniagua in the county jail where both men were awaiting trial. Appellant argues that if these extrajudicial statements had not been received in evidence, it is reasonably probable that the jury might have found him guilty of the lesser offense of voluntary manslaughter. We find no merit in either of these contentions.

Quite apart from the admissions made by the several defendants in their extrajudicial statements, the other uncontradicted, direct and unquestionably competent evidence was so overwhelming that the proof of the guilt of all three defendants was realistically conclusive.

The record portrays an unusually sordid picture. It shows that the three defendants had spent the afternoon of February 10, 1965, drinking wine with Frank Rochin, the victim of the murder, in an area near a crossing of the Pacific Electric and Santa Fe railroad tracks. At approximately 4:30 p.m. of that afternoon they were seen placing wood upon a large and intense fire from which the victim's feet were protruding. An autopsy revealed that although the victim had sustained certain rather severe injuries to his head before he was placed under heavy bedsprings and set afire, the cause of death was heat burns of the head, torso, arms and legs. Contributing to death was a searing of the lining membranes of the larynx and a swelling of the air passages into the lungs causing him "to

choke up and die.'' These findings definitely established that the deceased had been alive and breathing while in the fire.

Blood of the victim's type, as well as hairs from his head, were found upon defendants' shoes and clothing. A witness observed defendants kicking something in ''sort of a drainage ditch'' near the railroad tracks and thereafter saw them carrying someone who was unable to walk to the spot where the victim was subsequently cremated. Later in the evening of February 10, 1965, police officers stopped a group of six or seven men, including Paniagua and Calvillo, walking in the area and inquired of them as to their activities that day. Paniagua denied that he had been near the railroad tracks, asserting that he had been home all day. Calvillo made similar false statements. When the men's hands were examined Paniagua's and Calvillo's were found to bear ''grayish black smudges'' resembling marks made by charcoal or ashes and ''reddish brown spots.'' When asked about the latter spots Paniagua stated that he had ''just killed a chicken.''

Paniagua and Calvillo were arrested and fully advised of their constitutional rights to remain silent, to have the assistance of counsel at all stages in the proceedings, that they need not answer any questions asked of them but if they did ''anything said by them could be used in subsequent proceedings.''

Following his arrest, while Paniagua was seated alone in a room with a ''one-way glass,'' he was seen licking his hands. In his subsequent statement to the police Paniagua admitted that he had been drinking wine at the scene of the murder but asserted that he had returned home at about 3 p.m. and cleaned up the yard. Subsequently he went for a walk with a friend and was arrested. When advised that samples of the bloodstains on his hands would be examined and if they were not chicken blood he would not be able to ''fool'' the chemical tests, Paniagua said, ''I don't care, because it doesn't prove anything anyway.'' Trousers, shoes and socks found in Paniagua's residence were stained with blood of the victim's type. The blood on Paniagua's hands was determined to be human blood although its type could not be ascertained.

Calvillo made a free and voluntary statement with full knowledge of his constitutional rights in which he admitted that he and his codefendants had been sharing wine purchased by the victim. He stated that ''about 4:00 or 4:30'' the victim had refused to give Paniagua a drink from his most recently purchased bottle and therefore Paniagua took it

from him. When the victim became angry and began calling his companions names, Paniagua hit him in the face, whereupon the victim fled, running along the side of the railroad tracks. The three defendants pursued him and when they caught him they knocked him down and kicked him repeatedly in the head and body. They then carried him back to the place where they had been drinking and where a fire was burning in a barrel.

Defendants then decided to "finish him off" so that he "won't talk anymore." They covered him with boards, added the bedsprings and more boards over them and then "dumped the barrel of fire onto the pile of boards" and "he started burning up." The victim could be heard moaning while the flames consumed him.

After the parties had left the scene, appellant Wattie apparently suffered remorse and blamed Paniagua for what they had done and told him that he intended "to put the finger" on him to the police. Paniagua then struck appellant in the head several times with a rock and left him in a ditch beside the tracks while he returned to his house where he changed his shoes, socks and trousers.

The following evening appellant Wattie also made a statement to the police in the Los Angeles County General Hospital where he was being treated for the head injuries inflicted by Paniagua following the murder. Following a full *voir dire* hearing the trial court expressly found that this statement was freely and voluntarily given after appellant had been advised of his constitutional rights in accordance with the rule enunciated in *People v. Dorado,* 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361].

His statement substantially corroborated that given by Calvillo except that he tried to cast the primary responsibility for the murder upon his companions. That is, although he admitted kicking the victim in the head and standing by the fire hearing the victim "grunting" as the flames consumed him, he asserted that it was Calvillo's idea to burn the victim and that it was Calvillo who had put the fire from the barrel onto the victim's pyre. After they left the scene appellant told Paniagua that he was going to "finger him," whereupon Paniagua hit him above the left eye, knocking him unconscious. At the time he made his statement appellant said he was then "in control of" his "senses" and that the medication he had been given was not pills that "put" him "out" and he remembered "everything" he told the officers.

. In addition to the foregoing evidence, the prosecution called one Glenn Walton as a witness. Walton testified that on June 4, 1965, he was a prisoner in the Los Angeles County jail awaiting trial on charges of robbery and issuing checks without sufficient funds to honor them. He was in a "tank" with some 35 other prisoners including Paniagua. Walton testified that although he had only completed the ninth grade in school, he had taken certain correspondence school law courses and intended to represent himself in his impending criminal cases. As a result the other inmates sometimes called him "lawyer" and asked his opinion on various problems of their own. Walton testified that he never solicited these confidences since they interfered with his efforts to prepare his own case. He had never been asked by the police to obtain any information from his fellow prisoners and at the time of his conversations with Paniagua he had no intention of disclosing the contents thereof to the authorities.

During several conversations with Walton, Paniagua told him what evidence had been produced at his preliminary hearing and, based thereon, Paniagua expressed his opinion concerning the proof the prosecution would be able to make at his trial. He also told Walton the details of what actually had occurred. He told how he and two others had knocked the victim down and kicked and "stomped" him; how they had carried him across the tracks and put him down by the can where they had a fire going that day; how they had piled wood on top of the victim and set it afire because he was "no good" and they "had to get rid of the body;" how the victim was moving and moaning and groaning while they were adding wood to the fire; how they had sat around the fire drinking wine for an hour or so while the body was being consumed by the flames; how, when they left the scene, appellant had said that "they shouldn't have done that or something" and Paniagua "got mad at that and hit him in the head;" how he had then returned to his house and changed clothes and washed his hands to get the blood off.

Appellant was the only defendant who took the stand and, while he did not deny committing the murder, he testified that he had been too drunk to remember the events surrounding the victim's death and had merely repeated to the officers who questioned him the facts they had already related to him.

■ Obviously the foregoing evidence abundantly sustains the jury's verdicts as to each defendant. In Paniagua's case the evidence establishes that the killing was wilful, deliberate

and premeditated and further that the victim was intentionally killed by a method designed to produce pain and suffering sufficient to constitute torture. Murder so perpetrated is murder of the first degree. (Pen. Code, § 189.)

The intent to cause a victim to suffer in murder by torture may be inferred from the circumstances of the killing including the condition of the deceased's body and the admissions of a defendant. (*People* v. *Turville,* 51 Cal.2d 620, 632 [335 P.2d 678]; *People* v. *Misquez,* 152 Cal.App.2d 471, 480 [313 P.2d 206]. See also *People* v. *Martinez,* 38 Cal.2d 556, 561 [241 P.2d 224], where the defendant poured gasoline on the victim and ignited it, and *People* v. *Chavez,* 50 Cal.2d 778, 789 [329 P.2d 907], where the defendants, to avenge ejection from a bar, poured gasoline on the floor and ignited it, killing a victim by asphyxia and severe burns.)

The necessary wilfulness, deliberation and premeditation may be inferred from a variety of circumstances. Such circumstances include considerations of the method causing death, the means of disposing of the body and efforts to prevent its identification, the conduct of a defendant prior to and after the crime, the lack of provocation, the act of dragging a victim from one place to another where a murderous attack is continued, and the persistence in continuing an ultimately fatal attack. (*People* v. *Rittger,* 54 Cal.2d 720, 730 [7 Cal. Rptr. 901, 355 P.2d 645]; *People* v. *Hills,* 30 Cal.2d 694, 701 [185 P.2d 11]; *People* v. *Eggers,* 30 Cal.2d 676, 686 [185 P.2d 1]; *People* v. *Morris,* 174 Cal.App.2d 193, 197 [344 P.2d 333].) If the findings of fact which are implicit in the verdict are supported by the facts established and the reasonable inferences therefrom, then such findings are conclusive on appeal. (*People* v. *Scott,* 176 Cal.App.2d 458, 497 [1 Cal.Rptr. 600].)

Similarly, the facts established in the instant record are unquestionably sufficient to sustain the jury's determination that appellant was guilty of murder of the second degree. Appellant admitted kicking the victim and blood and hairs from his head were found on appellant's shoes. He was seen to assist the others in carrying the victim back to the fire, and even if his relatively self-serving explanation as to what transpired thereafter was to be accepted at face value, he concededly stood passively by while the victim of the joint assault in which he had participated was being burnt alive by his associates.

Appellant's contention regarding the asserted inad-

missibility of the testimony of the witness Walton is wholly unmeritorious since there is no evidence whatsoever to support the basic assumptions upon which it is based. That is, appellant argues that Paniagua's conversations with Walton were protected by the attorney-client privilege provided by Code of Civil Procedure, section 1881, subdivision 2, and further, relying on *Massiah* v. *United States*, 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], that Walton was an agent for the prosecution who deliberately elicited Paniagua's statements from him in violation of his constitutional right to representation by counsel.

However, the only evidence on the subject, which was not controverted in any fashion by Paniagua, establishes that at all times Paniagua knew that Walton was not a lawyer, that Walton told him that he was not a lawyer, that Walton advised him to seek the advice of a lawyer and told him that he would be a fool to try to handle the case himself. We, therefore, need not consider appellant's abstract speculations concerning the possibility that an attorney-client privilege might exist where one person falsely claims to be an attorney and another person in reliance thereon divulges damaging information to him.

 Similarly, there is no evidence tending to establish that Walton was an agent of the police. Walton clearly and convincingly testified that he had never sought any information from any prisoner and had no intention of communicating to the police the information they imparted to him at the time he received it. Walton testified that in discussing his own case with the officers after his conversations with Paniagua, he made some casual mention of Paniagua's case which led the officers to ask him to make a statement to them.[1] He agreed to

---

[1]During Walton's cross-examination by appellant Paniagua's trial counsel, the following questions and answers were given:

"Q. Now, it is not clear to me just how this conversation turned with the officer on the robbery matter—turned to the homicide case which Mr. Paniagua was involved in. How did that come up, precisely, if you remember? A. I was saying something about—he said, 'Well, you are handling your own case,' is what the robbery officer said, and I said, 'Yes.' And said something—he said, 'I bet you that you— . . .'—you know, better get a private counsel. And I told him I was thinking about it because I was being, you know, a lot of the time disturbed by the inmates in the jail while I was working on my own case. And I said there's one up there that kept bothering me quite often on a murder, and kept asking for legal advice, or some such. I said, 'Guys like that . . .' and I believe that was the way I termed it—I said, 'Guys like that make it sort of rough,' I said, 'to work on my own case.' So then some of the details of it came out and—— Q. Just a minute now. That's what I am asking you. You say some of the details came out. How did they come

do so because he wanted "to straighten out" his own life and believed that complete honesty was a necessary prerequisite thereto. The police promised him no reward nor any leniency in connection with his own problems in return for his cooperation and he expected none. Since the undisputed facts in the instant case establish that Walton was not acting in cooperation or complicity with the state, Paniagua's statements to him clearly were outside the proscription of *Massiah*. (*People* v. *Price*, 63 Cal.2d 370, 378 [46 Cal.Rptr. 775, 406 P.2d 55]; *People* v. *Teale*, 63 Cal.2d 178, 184-185, 195-196 [45 Cal.Rptr. 729, 404 P.2d 209]; *People* v. *Bowman*, 240 Cal.App.2d 358, 371 [49 Cal.Rptr. 772] et seq.; *People* v. *Flores*, 236 Cal.App. 2d 807, 810-812 [46 Cal.Rptr. 412].)

▮ Nevertheless, although the statements of each defendant were properly admissible in evidence against such defendant, appellant is correct in his contention that the trial court erred in failing to conform to the new rules regulating the use of extrajudicial statements subsequently promulgated in *People* v. *Aranda*, 63 Cal.2d 518, 530-531 [47 Cal.Rptr. 353, 407 P.2d 265]. The partial retroactivity of these rules was established in *People* v. *Charles*, 66 Cal.2d 330, 335-337 [57 Cal. Rptr. 745, 425 P.2d 545]. This error, however, does not require automatic reversal.

In *Aranda* the court stated at pages 526-527: "The giving of such instructions [that a confession implicating both defendants is to be considered only against the declarant], however, and the fact that the confession is only an accusation against the nondeclarant and thus lacks the shattering impact

---

out? A. Just in the manner I tried to explain to you. Q. Well, they just sort of boiled right out of you or out of the officer, or out of who? You say some of them came out. Now, I don't understand it. A. Well, the remarks that I made were concerning people disturbing me while I was working on my own case. I just happened to mention one guy that had been disturbing me most that was in there for a murder charge, and he kept trying to elicit information or answers from me. Q. The officer then started asking you about the facts of the other man's case? A. No. I had said something about it; he was in for killing a guy in Norwalk, burned him to death, and that he had said that he was going to beat it because the other guy had signed a confession, or something, but they were going to make him look bad in court. So then he told me just to sit there. He said, 'Just sit there.' And he said, 'I will call somebody else.' And that's when I spoke to Mr. Sholund. Q. Were you asked at that time if you would be willing to come down and testify against Mr. Paniagua? A. Yes. Q. When was that? A. That was after the statement was taken, I believe. Q. Did you ever ask the officer at any time if he would be willing to speak a good word for you or try to help you in the processing of your case? A. No, I did not. Q. You never asked him if he would help at all? A. No, I didn't."

of a self-incriminatory statement by him [citation] preclude holding that the error of admitting the confession is always prejudicial to the nondeclarant.'' That is to say, even in a case such as *Aranda* where the confession in issue should never have been admitted into evidence in the first instance, and its receipt automatically required a reversal of the judgment as to Aranda's codefendant, the declarant, it was still necessary to apply California Constitution, article VI, section 13, before determining whether or not a reversal was required as to Aranda.

In *Aranda*, ''some doubt'' was cast upon the evidence tending to identify appellant Aranda as one of the two robbers. He took the stand and testified to his innocence and his testimony was partially corroborated by that of a police officer. Moreover, apart from his codefendant's confession, ''No evidence linked the two [defendants] together at any other time relevant to the commission of the robbery.'' (P. 531, fn. 10.) Under these circumstances, the court concluded that the judgment should be reversed as to Aranda, who had consistently maintained his innocence, as well as to his codefendant who had confessed but whose confession was improperly obtained in violation of the rule of *People* v. *Dorado, supra,* 62 Cal.2d 338.

On the other hand, in *People* v. *Charles, supra,* 66 Cal.2d 330, the court concluded that a violation of the *Aranda* rule did not require a reversal as to Charles even though a reversal was ordered as to his codefendant whose confession obtained in violation of *Dorado* implicated Charles. Charles, unlike Aranda, had himself confessed to the crime charged and his confession was properly received in evidence against him. In addition, the evidence *aliunde* the confessions, was strongly demonstrative of Charles' guilt. The court passed upon this question in the following language at pages 337-338:

''As we have previously indicated, however, failure to adhere to the *Aranda* procedure constitutes reversible error only if it causes prejudice. Although we find no such prejudice here as to either defendant, the record fails to dispel Boddie's contention that his confession, unlike that of Charles, was obtained in violation of *Escobedo* and *Dorado*. As we later explain, the introduction of Boddie's inadmissible confession constituted error as to both defendants; that error was automatically prejudicial as to Boddie but not as to Charles. We have therefore concluded that the conviction of Boddie, but not that of Charles, must be reversed.

''Turning first to the basic *Aranda* violation, we consider crucial the fact that each defendant's case was completely shattered by his own detailed confession, corroborated by the eyewitness testimony of the robbery victim. In this setting, the fact that each defendant was also implicated by his codefendant's confession cannot realistically have contributed to either conviction. Although the present case was tried by a judge sitting without a jury, we need not decide whether that fact alone would here preclude the requisite showing of prejudice, since we find no reasonable probability in this case that even a jury would have returned a more favorable verdict for either defendant if, as required by *Aranda,* the defendants had been tried separately or each confession had been 'edited' to include no references damaging to the nondeclarant. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836 [299 P.2d 243].) ''

Similarly, in *People* v. *Hill,* 66 Cal.2d 536, 558-559 [58 Cal.Rptr. 340, 426 P.2d 908], in which consistent confessions by each of three defendants were received in evidence, the court disposed of the *Aranda* error in the following terms:

''In view of the other competent and overwhelming evidence against both Hill and Saunders, the codefendants' confessions could not have had any reasonable bearing on the convictions. Hill's confession of September 23, individually admissible against him, shows the depraved and senseless manner in which he elected to kill his victim. Saunders' statements of September 19 and particularly of September 23, when considered with other direct and circumstantial evidence independent of his codefendants' extrajudicial statements, admittedly constitute a confession and clearly establishes his guilt under the felony-murder doctrine. (See *People* v. *Charles* [*supra*] *ante,* pp. 330, 338 [57 Cal.Rptr. 745, 425 P.2d 545].) In addition to the confessions, Madorid's testimony of the participation of each defendant in the crimes was incriminating and substantial. Niehoff testified as to the very incriminating conduct and statements made by defendants while he was forced to drive them to Las Vegas, and Mr. Wosk and other persons testified concerning Hill's and Madorid's conduct at the liquor store.

''When the impact of the foregoing is weighed against the codefendant confessions, vitiated by the trial court's instructions that the jury should not consider them as evidence against the nondeclarants (see *People* v. *Gilbert,* *supra,* 63 Cal.2d 690, 702 [47 Cal.Rptr. 909, 408 P.2d 365]), we must conclude that there is no reasonable probability that the jury

would have returned a more favorable verdict for either Hill or Saunders if, as required by *Aranda,* they had been tried separately. (Cal. Const., art. VI, § 13; *People* v. *Charles,* [*supra*] *ante,* pp. 330, 332 [57 Cal.Rptr. 745, 425 P.2d 545]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) A reversal as to either defendant thus cannot be predicated on this ground.'' (Compare *People* v. *Gonzales,* 66 Cal.2d 482, 494 [58 Cal.Rptr. 361, 426 P.2d 929] et seq. where the evidence of guilt was so ''extremely close, [that] 'any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial.' [Citation.]'')

As we have previously indicated, the evidence against appellant apart from his own confession, and those of his codefendants, was exceedingly strong. He was seen kicking something in an area where blood of the victim's type was later discovered. Similar blood stains were found upon his shoes, the upper right leg of his trousers and upon his shirt. A nine inch dark brown human head hair, approaching black, was found ''draped over'' both the interior and exterior side of his shoe. A human leg hair also was found on one of his shoes, and these hairs were so similar to each other and to another found upon codefendant Calvillo's shoes that they could have come from the same individual. The victim's sister described his hair as being of the the type found on appellant's shoe. Further, appellant was seen and identified as sitting beside the fire while the victim's body was being consumed.

In his own confession, appellant admitted kicking the deceased twice during the period he was on the ground and later listening to him ''grunting'' as he was being burned alive. Somewhat paradoxically the statements of appellant's codefendants tended to aid appellant in that they confirmed and stressed those aspects of his involvement that might have gained him some consideration from the jury. They corroborated his claim of being intoxicated and his statement that he had expressed feelings of remorse after the event.

Perhap Paniagua might reasonably have argued that he had been prejudiced by the *Aranda* error here involved since, absent the parties' several extrajudicial statements, there would be little basis for finding him more culpable than his companions. However, such error was certainly not prejudicial to appellant. We, therefore, dispose of this aspect of appellant's appeal in the following apposite paraphrase of

the holding in *People* v. *Charles, supra,* 66 Cal.2d 330, 338:

"Turning first to the basic *Aranda* violation, we consider crucial the fact that each defendant's case was completely shattered by his own detailed confession, corroborated by the eyewitness testimony of [the independent witnesses]. In this setting, the fact that each defendant was also implicated by his codefendant[s'] confession cannot realistically have contributed to [his own] conviction. . . . [W]e find no reasonable probability in this case that [the] jury would have returned a more favorable verdict for [appellant] if, as required by *Aranda,* the defendants had been tried separately or each confession had been 'edited' to include no references damaging to the non-declarant[s]."

Finally, we find nothing in *People* v. *Conley,* 64 Cal.2d 310, 324-325 [49 Cal.Rptr. 815, 411 P.2d 911], which would require a reversal in the instant case. Although this case was tried before the decision in *Conley* and therefore the suggested instruction set forth in footnote 4 was not given, appellant concedes that "manslaughter instructions were given as well as instructions on voluntary intoxication . . . [and] on the relationship of mental condition to specific intent."

The judgment is affirmed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied September 1, 1967, and appellant's petition for a hearing by the Supreme Court was denied October 5, 1967. Peters, J., was of the opinion that the petition should be granted.