[Crim. No. 12927. Second Dist., Div. Two. Feb. 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RONALD RAYMOND STEPHANSON, Defendant and Appellant.

Ansley Q. Hyman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

FLEMING, J.—Stephanson was convicted of first degree murder and of two assaults with a deadly weapon with intent to murder. The conviction grew out of an early morning automobile foray into Watts by three men armed with a shotgun ''to go get some niggers.''

On appeal Stephanson contends (1) there was insufficient evidence of murder in the first degree, (2) the instructions on manslaughter did not adequately cover voluntary killing

without malice by reason of diminished capacity, and (3) instructions on involuntary manslaughter should have been given.

## The Evidence of First Degree Murder

On the evening of 9 February 1966, Aubrey, age 26, appellant Stephanson, age 19, and DeVough, appellant's brother-in-law, age 15, each of whom is white, were working on Stephanson's car near his Burbank apartment and drinking beer. About midnight the three went to a bar in Aubrey's automobile, drank beer until 2:20 a.m., and then returned to Stephanson's apartment. Earlier Aubrey had complained about having been recently run off the road by an automobile occupied by Negroes. Outside the apartment Aubrey suggested that Stephanson get his shotgun and that they go to Los Angeles. Go to Watts, Stephanson asked; yes, Aubrey replied. Stephanson then went upstairs, changed his clothes, and returned with his shotgun and six or eight shells, some of which he gave to DeVough and Aubrey and some of which he kept. The three started out in Aubrey's automobile for the Watts area of Los Angeles.

DeVough testified that after two stops and changes of position in the automobile, he was driving, Aubrey was next to him, and Stephanson was in the back seat with his shotgun. During the drive Stephanson asked DeVough for another shell.

About 3 a.m. Aubrey's automobile was in the vicinity of Broadway and Florence Avenue, where a stranger to its occupants, a Negro sailor named Mickey Garron, was standing on the corner waiting for a bus. A shot was fired from the back seat of the automobile and Garron was hit. DeVough testified that after the shooting Aubrey asked, Did you get him, and Stephanson answered, Yes. Immediately after Garron was shot, DeVough turned at the intersection and passed a car occupied by two other strangers, Roberts and Myles, also Negroes. DeVough saw Stephanson on his knees with the shotgun pointed out the window as though he were going to fire again. Roberts and Myles, seeing a man in the rear seat of Aubrey's automobile pointing a long-barrelled gun at them, swerved their car into a gas station and fell to the floorboard. No shots were fired. This incident formed the basis for the two counts of assault with a deadly weapon with intent to murder.

Additional evidence on the shooting was given by Harold Mortz, who about 3 a.m. was driving on Broadway near its

intersection with Florence. An automobile with two men in the front seat passed him, and he saw a third person in the back seat holding a long object in his hand. The three occupants of the automobile were looking back at the corner of the intersection where a sailor was standing at a bus stop. Their automobile turned off Broadway two or three blocks past Florence. Because his suspicions had been aroused, Mortz made a U-turn and saw the same automobile return to Broadway and head back toward Florence. At the intersection the automobile slowed almost to a stop, and Mortz heard a loud report. A sailor got up from a crouched position and, staggering perceptibly, ran down Broadway. The automobile immediately accelerated into Florence.

Deputy sheriffs arrested the occupants of Aubrey's car about 3:55 a.m.

Garron died of over 70 wounds from shotgun pellets in the face, head, neck, and chest. Aubrey and Stephanson were charged with Garron's murder and with assaults with a deadly weapon with intent to murder Roberts and Myles.

 Stephanson argues his murder conviction should be reduced from the first to the second degree because the only evidence of premeditation was the self-contradictory testimony of DeVough. On the day of his arrest DeVough stated that Aubrey had been in the back seat at the time of the shooting. But at the trial DeVough testified that Stephanson had been in the back seat when the shot was fired, and that his earlier statement placing Aubrey in the back seat had been an attempt to protect his brother-in-law. The credibility of DeVough's testimony was a matter for evaluation by the jury. If the jury believed DeVough, as it was entitled to do, appellant set out with a shotgun for an area where Negroes were likely to be found, implicitly understanding that the object of the trip was to do violence to one or more Negroes. On his arrival he fired a shotgun blast at a Negro victim selected at random. From such testimony the jury could have found that appellant killed Garron with premeditation and deliberation, that is, he "carefully weigh[ed] the course of action . . . and cho[se] to kill his victim after considering the reasons for and against it." (*People* v. *Conley,* 64 Cal.2d 310, 321-322 [49 Cal.Rptr. 815, 411 P.2d 911].) This evidence was sufficient to sustain the verdict of first degree murder.

*Instructions on Manslaughter and Diminished Capacity*

 Stephanson contends the court erred in defining voluntary manslaughter as an unlawful killing without malice

committed upon a sudden quarrel or in heat of passion. This definition, he argues, fails to cover an intentional homicide committed by one who lacks sufficient capacity for malice to make his act murder; such an act by such an actor, being a killing without malice, falls within the category of manslaughter. His claim here, of course, is that the jury could have found that his capacity for malice was diminished by his intoxication. DeVough testified that Stephanson had consumed considerable beer that evening and was drunk. Stephanson's wife, who had seen him when he picked up his shotgun, testified that at that time he was fairly close to being drunk. On the other hand, the arresting officers testified that although Stephanson had been drinking, he did not appear drunk to them.

The instructions relevant to this contention included: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree."

This instruction was followed by one distinguishing manslaughter from murder: "Manslaughter is distinguishable from murder principally in this: That though in manslaughter the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is an essential element of murder, is wanting, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionately lenient.

"When the mortal blow, though unlawful, is struck in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation, the law, out of forbearance for the weakness of human nature, will disregard the actual

intent, and will reduce the offense to manslaughter. In such a case, even if an intent to kill exists, the law deems that malice, which is an essential element of murder, is absent.''

The next instruction defined manslaughter in statutory language (Pen. Code, § 192) : ''Manslaughter is the unlawful killing of a human being, without malice. The definitions of two kinds of manslaughter are as follows:

''1. Voluntary manslaughter is that which is committed upon a sudden quarrel or heat of passion.

''2. Involuntary manslaughter is that which is done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner or without due caution or circumspection.''

The court also instructed: ''If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder.''

Stephanson contends the court should have supplemented the statutory definition of voluntary manslaughter, i.e. killing upon a sudden quarrel or heat of passion, by adding, as he had proposed, the category of killing without malice because of diminished capacity from intoxication. In the absence of such an instruction, he argues the jury must have received the impression ''that provocation and heat of passion were mandatory to find manslaughter.''

Unquestionably, the instructions should have further elaborated the possibility that a diminished capacity for malice may transform conduct which is otherwise murder into manslaughter. (*People* v. *Conley,* 64 Cal.2d 310, 325 [49 Cal. Rptr. 815, 411 P.2d 911] ; *People* v. *Henderson,* 60 Cal.2d 482 [35 Cal.Rptr. 77, 386 P.2d 677].) In the companion case of *People* v. *Aubrey,* 253 Cal.App.2d 912 [61 Cal.Rptr. 772], tried under the same indictment and, we are told, submitted to the jury under substantially the same instructions, another division of the Court of Appeal reversed Aubrey's conviction for murder, concluding that the instructions were prejudicially erroneous to the accused because the jury had not been specifically told that the offense of manslaughter might include an intentional killing in which the element of malice was not present because of diminished capacity.

Both appellant and the opinion in *Aubrey* principally rely on *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d

911], to establish the prejudicial effect of the lack of a specific instruction showing the exact relationship of murder, diminished capacity, and manslaughter. Conley, after several days of drinking, shot his paramour and her husband. He testified he had no conscious intention to kill and remembered nothing about the shooting. The trial court took the view that manslaughter only comprehended killing under provocation or in the heat of passion and refused to give any instruction on manslaughter, and Conley was convicted of first degree murder. The Supreme Court reversed the conviction, holding that the court should have instructed on manslaughter because there was evidence of diminished capacity from intoxication which might have negated the element of malice necessary to make a homicide a murder. Malice is a state of mind, and a defendant may show the absence of a state of mind essential to the crime of which he is accused. (64 Cal.2d at pp. 316-317.) That being so, a voluntary killing without malice falls within the class of unlawful homicides known as manslaughter, and the two types of voluntary manslaughter referred to in the statute—deliberate killings upon sudden quarrel or heat of passion—do not exhaust the categories of the offense, since there is at least one further type, that occurring during a period of diminished capacity. "Since the jury was not advised that diminished capacity could negate the existence of malice and that if malice were absent the offense could not be murder, a material issue was withheld from its consideration." (64 Cal. 2d at P. 319.)

There is a significant difference between *Conley* and the present case. In *Conley* the court gave no instructions at all on manslaughter, and accordingly, the validity of the principal defense offered by the direct testimony of the defendant was not passed upon by the jury. Here, instructions on diminished responsibility, on manslaughter, and on doubt between murder and manslaughter, were all given. The possibility of a manslaughter verdict was made clear to the jury, and the sole defect in the instruction defining manslaughter lay in its failure to specify killing during a period of diminished capacity as a separate type of unlawful killing without malice. Were we writing on a clean slate we would be inclined to the view that for all practical purposes the instructions sufficiently differentiated killing with malice from killing without malice and sufficiently articulated the significance of the presence or absence of malice. (Cf. *People* v. *Wattie,* 253 Cal.App.2d

403, 415 [61 Cal.Rptr. 147].)[1] Yet we are not dealing with an isolated case but rather with one intimately related to a previous judgment. Since the court in a companion case concluded that similar instructions were erroneous, for the sake of consistency we adopt a similar view and conclude that the incompleteness of the instructions in the present case rose to the level of error.

Nevertheless, although we accept the reasoning of the *Aubrey* case, we must still determine whether the error was prejudicial to appellant within the meaning of article VI, section 13, of the California Constitution. In *Conley* the court found the error prejudicial because it amounted to a denial of the right to have a significant issue raised by the defense determined by the jury. Does the same result follow in the case at bench? Certainly the incompleteness of the instructions on manslaughter was far less damaging to Stephanson than the total absence of such instructions was to Conley. The substance of the defense of manslaughter was presented to the Stephanson jury and the availability of a manslaughter verdict made clear to it. Yet, this was also true in *Aubrey*, and the court there concluded the defect in instructions was prejudicially erroneous. Are there, then, differences between Stephanson's and Aubrey's cases of sufficient magnitude to make affirmance of Stephanson's conviction consistent with the reversal of Aubrey's conviction?

Our examination of the record convinces us there are such differences. Two critical factors differentiate Stephanson's case from Aubrey's and make the error nonprejudicial.

First, Stephanson was the actual assassin, not a passenger in the automobile at the time of the shooting. Aubrey's role in the shooting was that of an aider, inciter, and co-conspirator; Stephanson's that of the actual triggerman. On Aubrey's behalf it is at least arguable that during the period leading up to the killing he did not have sufficient capacity for malice to appreciate the direction in which events were headed nor did he ever intend to take part in a real shooting. The same is less likely to have been true of the gunman himself. To load, to aim, to pull the trigger, each involves an affirmative act

---

[1] "Finally, we find nothing in *People* v. *Conley*, 64 Cal.2d 310, 324-325 [49 Cal.Rptr. 815, 411 P.2d 911], which would require a reversal in the instant case. Although this case was tried before the decision in *Conley* and therefore the suggested instruction set forth in footnote 4 was not given, appellant concedes that 'manslaughter instructions were given as well as instructions on voluntary intoxication . . . [and] on the relationship of mental condition to specific intent.' " (*People* v. *Wattie*, 253 Cal.App.2d 403, 415 [61 Cal.Rptr. 147].)

which manifests the actor's state of mind and suggests his capacity for malice. In contrast, it is possible that an aider and inciter may call for action by someone else without seriously intending that any action be taken and without actual malice in his heart. For example, the bystander to a friend's resistance to arrest may tell his friend to use a baseball bat on the policeman, not with any expectation or desire that his friend will do so, but merely to lend him moral support, to strike a popular attitude, heighten the excitement, and risk a small flirtation with danger. Since proof of the malice of an aider and inciter must normally be inferred from less positive acts than those of the actor, evidence of the aider's diminished capacity may more easily rebut an inference of malice than in the case of the actor himself. This being so, the absence of an instruction on the precise relationship of diminished capacity to manslaughter, which could prove prejudicial to one who plays the less physically active role of an aider and inciter may, as we think here, be inconsequential when the responsibility of the killer himself is at issue.

The second reason we deem the incomplete instruction on manslaughter non-prejudicial is that the jury convicted Stephanson on two assaults *with intent to murder* in connection with acts which took place seconds after the shooting of Mickey Garron. The assaults charged in counts II and III were submitted to the jury under appropriate instructions not subject to the misconception made possible by the manslaughter instruction,[2] and the jury found Stephanson guilty of two crimes which included murderous intent as one of their elements. Aubrey had also been charged with the same two assaults with intent to murder, but the jury only convicted him of assaults with a deadly weapon, lesser-included offenses in which intent to murder is not an element and intoxication not a defense. Thus the jury in Aubrey's case was apparently not convinced beyond a reasonable doubt of Aubrey's mur-

---

[2] "In the crime of assault with a deadly weapon with intent to commit murder, of which the defendant is accused in counts II & III of the indictment, the specific intent to commit murder is a necessary element of the crime. [Thus the defendant may not be found guilty of the crimes charged against him in [counts II & III of] the indictment unless you can and do find from the evidence that he had the specific preconceived intent to kill a human being.] This fact requires an inquiry into the state of mind under which the defendant committed the act charged, if he did commit it. In pursuing that inquiry, it is proper to consider whether he was intoxicated at the time of the alleged offense. The weight to be given the evidence on that question and the significance to attach to it, in relation to all the other evidence, are exclusively within your province."

derous intent in connection with the assaults on Roberts and Myles. In sharp contrast, the jury in Stephanson's case had no such reservations, and its verdict in counts II and III that Stephanson possessed a murderous intent seconds after his killing of Mickey Garron conclusively manifests its view of the malice with which he perpetrated the Garron killing and demonstrates for us that the incompleteness of the instruction on manslaughter was non-prejudicial. We conclude that the misdirection of the jury in the manslaughter instruction did not constitute a miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

*Instructions on Involuntary Manslaughter Not in Point*

Stephanson also attacks the instructions because they failed to cover the possibility of involuntary manslaughter. His requested instruction, taken from *Conley* read: ". . . if you find that the defendant killed while unconscious as a result of voluntary intoxication and was therefor [*sic*] unable to formulate a specific intent to kill or to harbor malice, his killing is involuntary manslaughter. . . ."

The Attorney General contends there was no evidence of unconsciousness and that the instruction would have been superfluous. We agree. In other cases involving the defense of unconsciousness testimony as to the existence of such a state has been introduced. (See, e.g. *People* v. *Bridgehouse,* 47 Cal. 2d 406 [303 P.2d 1018]; *People* v. *Baker,* 42 Cal.2d 550 [268 P.2d 705].) In the case at bench no testimony was given by Stephanson or anybody else that he had reached a state in which his "conscious mind ha[d] ceased to operate and his actions [were] controlled by the subconscious or subjective mind . . ." (*People* v. *Sameniego,* 118 Cal.App. 165, 173 [4 P.2d 809, 5 P.2d 653].)

The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 17, 1968. Peters, J., was of the opinion that the petition should be granted.