[Crim. No. 12914.   Second Dist., Div. Four.   Aug. 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. LLOYD WILSON AUBREY, JR., Defendant and Appellant.

914

Marvin Zinman, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—Appellant and Ronald Stephanson were charged with three offenses: count I, the murder of Mickey L. Garron (Pen. Code, § 187); counts II and III, assault with a deadly weapon with intent to murder Keford Roberts and Lee Myles respectively (Pen Code, § 217). Appellant was tried separately from his codefendant. A jury found appellant guilty of murder in the first degree and fixed the penalty at life imprisonment. On counts II and III he was found guilty of assault with a deadly weapon (Pen. Code, § 245), a lesser and included offense. This appeal is from the judgment.

The evidence, read in the light most favorable to the respondent, as the rules of appellate review require (*People* v.

*Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]), shows the following:

At about 2:10 a.m. on February 10, 1966, appellant, aged 26, Stephanson, aged 19, and Stephanson's brother-in-law, Daniel, aged 15, left a bar in Burbank where they had been drinking beer. Appellant suggested that they obtain Stephanson's shotgun and "go into Watts." They proceeded to Stephanson's apartment in appellant's automobile, a white 1954 Studebaker. Stephanson placed the shotgun in the back seat and gave three shells to appellant and two to Daniel. Stephanson said, " 'Are we going down into Watts?' " and appellant said " 'Yes.' " As they left the apartment appellant was driving and the other two were in the front seat beside him. Sometime later they stopped to open some cans of beer. Stephanson moved into the rear seat and Daniel drove, with appellant in the right front seat. As they drove, Stephanson asked Daniel for a shell, and Daniel handed him one.

At about 3 a.m. Mickey Garron, a Negro, wearing a navy uniform, was standing at a bus stop at the intersection of Broadway and Florence in Los Angeles. As the white Studebaker drove by, appellant directed the driver to stop and back up. Stephanson then fired the gun, killing Garron. Appellant asked, " 'Did you get him?' " and Stephanson answered " 'Yes.' "

A few moments later on Florence Avenue near Main Street the Studebaker came alongside a car driven by Keford, with Myles as a passenger. Stephanson pushed the barrel of his gun through the window of the Studebaker and pointed it at Keford and Myles, who were about 6 feet away. Keford shouted a warning and "jammed the brakes," as both he and Myles fell to the floorboard. The Studebaker went on past, and no shot was fired.

The shooting of Garron was reported to the police by eyewitnesses, and at 3:54 a.m. the police stopped the white Studebaker on East 118th Street and arrested the occupants. Three shotgun shells were found in appellant's pocket. One of the arresting officers testified that appellant was sober. Other officers were of the opinion all three men were under the influence of alcohol, but not drunk.

Daniel was called as a witness for the prosecution and testified as to the events preceding the killing. His credibility was impeached by some conflicts between his testimony and some statements he had made before the trial. He admitted that he had at first told the police falsely that appellant was

the passenger in the rear seat who had fired the gun. But the case does not rest upon the testimony of Daniel alone. Persons in the vicinity of the shooting testified that the shots came from a white Studebaker containing three white men. The expended shell, found at the scene, was shown to have been fired from the shotgun which was in appellant's car at the time of the arrest. Even without Daniel's testimony it is established that the fatal shot was fired from appellant's automobile, while appellant was in the vehicle, and that additional shells for the gun were being carried in appellant's pocket.

Appellant offered no evidence except the extrajudicial statements of Daniel, which were offered solely as impeachment.

Several contentions made by appellant here may be disposed of very briefly.

■ Appellant's argument that the evidence is as a matter of law insufficient to establish first degree murder appears to be based upon the assumption that this court must reject the testimony of Daniel in its entirety. This argument fails because of the established principle that credibility is an issue exclusively for the jury. There is nothing inherently incredible about Daniel's testimony that appellant suggested that they take a shotgun and drive to Watts. Indeed that is the only explanation in the record for what we know happened afterwards. Although appellant never touched the shotgun, the jury could reasonably find him criminally responsible either as a member of a conspiracy or as one who aided and abetted a malicious and premeditated killing.

There is no merit in appellant's contention that the trial court gave the prosecution too much latitude and unreasonably restricted appellant's examination of Daniel. The portions of the transcript cited in appellant's brief do not support the charge. The trial court handled this difficult and delicate task with an even-handed skill which leaves little basis for hindsight criticism.

■ It was not error to refuse to receive in evidence the written notes which had been made and signed by Daniel when he had been interviewed by a police officer and by a deputy district attorney prior to the trial. These documents had been furnished to the defense, so that appellant's attorney was able to cross-examine Daniel at the trial concerning the inconsistencies between his testimony and the documents. As a part of the cross-examination, appellant offered these documents in evidence. In refusing the offer, the court pointed out that counsel had already put in evidence every-

thing in them which was pertinent to Daniel's testimony, and that there was other matter in the documents which was not in evidence and which would be damaging to the appellant. The only legitimate purpose of the offer was to attack the credibility of Daniel; and since the appellant had already had the benefit of this, through Daniel's testimony that he had made the earlier conflicting statements, the documents were at most cumulative.

The difficult issue in the case is the sufficiency of the instructions given to the jury. In approaching that problem it is necessary to note that Daniel testified that all three of them had been drinking beer, and that all three were very drunk. Thus it became the duty of the court to explain to the jury the effect appellant's intoxication would have upon his culpability.

In its instructions, the court explained that manslaughter is distinguishable from murder in that malice is an essential element of the latter. Malice was defined and explained. The jury was told that if it found from the evidence that at the time the alleged crime was committed the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication, or any other cause, it must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder; and that if his mental capacity was so diminished that there was a reasonable doubt whether he did harbor malice, he could not be found guilty of murder.

The court further instructed: "Manslaughter is the unlawful killing of a human being without malice. The definitions of two kinds of manslaughter are as follows: 1. Voluntary manslaughter is that which is committed upon a sudden quarrel or heat of passion. 2. Involuntary manslaughter is that which is done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner or without due caution and circumspection."

The instructions elaborated upon the meaning of "heat of passion."

Appellant makes no contention that any of these instructions is erroneous as an abstract statement of law. His point is that the jury was not told that he could have been convicted of the kind of manslaughter which is defined in *People* v. *Conley*, 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].

In *Conley*, a conviction of first degree murder was reversed because of the failure of the trial court to instruct on manslaughter. The defendant had testified that he did not intend to kill and he could not remember what he had done. A blood test showed alcohol sufficient for intoxication. The opinion points out that evidence of intoxication may be considered by the jury to rebut malice. Referring to an earlier case, the court said (at p. 318) : ''We thus gave effect to the statutory requirements for the offense of manslaughter, 'the unlawful killing of a human being without malice,' and recognized that since the statute had been enacted before the concept of diminished capacity had been developed, its enumeration of nonmalicious criminal homicides did not include those in which the lack of malice results from diminished capacity. That enumeration could not be exclusive, for in the absence of malice a homicide cannot be an offense higher than manslaughter. [Citations.] Accordingly, a finding of provocation sufficient to reduce murder to manslaughter is not the sole means by which malice can be negated and voluntary manslaughter established. A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect, or intoxication, and in such case his killing, unless justified or excused, is voluntary manslaughter.''

Referring to the *Conley* verdict, the court said (at p. 320) : ''In returning a verdict of first degree murder, the jury found that defendant's act was intentional, voluntary, deliberate, and premeditated. They did not necessarily find, however, that defendant acted with malice aforethought.''

The *Conley* opinion also contains a form of jury instruction suggested by the Supreme Court for such cases. This instruction defines manslaughter in these terms (at p. 325, fn. 4) :

''Manslaughter is the unlawful killing of a human being without malice. Two kinds of manslaughter, the definitions of which are pertinent here, are :

''1. Voluntary manslaughter, an intentional killing in which the law, recognizing human frailty, permits the defendant to establish the lack of malice either by

''a. Showing provocation such as to rouse the reasonable man to heat of passion or sudden quarrel. When such provocation is shown, the law will presume that the defendant who acts in the heat of passion or on sudden quarrel, acts without malice. I instruct you that as a matter of law no such provocation was shown to exist at the time of the killing of Mr. and Mrs. McCool. Or by

"b. Showing that due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not attain the mental state constituting malice.

"2. Involuntary manslaughter is. . . ." (The remainder is not pertinent here.)

What the *Conley* opinion teaches is that there is a type of voluntary manslaughter which does not come within any of the three definitions found in Penal Code section 192.[1] *Conley* holds that voluntary manslaughter includes type (a), which is defined in the Penal Code, and type (b), which has been developed out of the doctrine of diminished capacity.

The nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated, and unprovoked. It differs from murder in that the element of malice has been rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication.

To explain manslaughter in terms of its statutory elements, as set forth in section 192, does not reveal to the jury the existence of the nonstatutory form of the offense. The statutory definition carries the implication that only a homicide provoked by passion or a sudden quarrel can be classified as voluntary manslaughter.

The Attorney General argues that upon the instructions given, the verdict necessarily implies a finding by the jury that appellant was not so intoxicated as to lack malice. As a matter of logic, this is true.

The import of the instructions given in this case is that (a) the jury may find that intoxication rebuts malice, and (b) if malice is eliminated, the defendant cannot be convicted of murder. The jury was told of only two kinds of manslaughter, neither of which applies to an intentional and unprovoked homicide. If the jury had found intoxication sufficient to rebut malice, the only logical verdict under these instructions was not guilty. The finding of guilty of murder necessarily implies a finding of malice.

But such a reasoning process has been rejected by the Supreme Court, in overturning murder convictions when the issue of manslaughter might have been but was not submitted to the jury. (See e.g.. *People* v. *Jeter*, 60 Cal.2d 671. 676 [36 Cal.Rptr. 323, 388 P.2d 355]; *People* v. *Modesto*, 59 Cal.2d

[1]"Manslaughter is the unlawful killing of a human being without malice. It is of three kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary— . . . 3. In the driving of a vehicle— . . ."

722 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Miller,* 57 Cal.2d 821 [22 Cal.Rptr. 465, 372 P.2d 297].)

We note several factual distinctions between the *Conley* case and the case at bench: ■ First, Conley's claim of diminished capacity was supported by his own testimony that he could not remember, by a blood alcohol test, and by the opinion of a psychologist; appellant here relies only upon the testimony of an accomplice. But the record in this case does contain substantial evidence of intoxication, and this alone may support a finding of diminished capacity.[2]

■ Second, Conley fired the fatal shots, while we have here only a conspirator or an aider and abettor. Nevertheless, some mental capacity is required in order to participate culpably either as conspirator or accessory, and it follows that proof of intoxication could negate the existence of the state of mind requisite to culpability as a conspirator or an accomplice.

Third, in *Conley* the defendant requested proper manslaughter instructions. ■ In the case at bench defendant requested instructions on manslaughter as a lesser included offense, which the court gave, but defendant failed to request the particular instruction which, under the *Conley* doctrine, should have been given. In *People* v. *Manzo,* 9 Cal.2d 594, 598 [71 P.2d 119], the court said: "If there was sufficient evidence in the case upon which the jury might have returned a verdict of manslaughter, an instruction defining it should have been given even if not offered by the defendant. In the trial of criminal cases it is the duty of the judge to instruct the jury on all of the general principles of law pertinent to the case."

In *People* v. *Henderson,* 60 Cal.2d 482, 491 [35 Cal.Rptr. 77, 386 P.2d 677], a murder conviction was reversed for failure of the court to give on its own motion instructions upon the legal significance of evidence of diminished capacity.

In the light of these authorities, we cannot say that the failure of defendant to request additional instructions precludes a reversal.

■ Furthermore, defendant's attorney did orally advise

---

[2]"Although expert testimony with regard to a defendant's inability to achieve a specific state of mind may be necessary when the defense of diminished capacity is based upon mental disease or defect, such testimony is not essential to a determination by a jury that a defendant has diminished capacity to achieve a specific state of mind because of intoxication." (*People* v. *Conley,* 64 Cal.2d 310, 325 [49 Cal.Rptr. 815, 411 P.2d 911].)

the court of his objection to two instructions which defined provocation and heat of passion. These objections were well taken, for there was no evidence of any sudden rage or heat of passion. The court's instruction upon this subject only served to imply that on this record there could be no conviction of voluntary manslaughter.

We are thus compelled to hold that the trial court erred in instructing the jury on voluntary manslaughter only in terms of the statutory definition, and in failing to advise the jury that a deliberate and unprovoked homicide may be manslaughter.

With respect to the convictions for felonious assault (counts II and III), the evidence is sufficient to support the judgment, and our review of the record discloses no error. Those convictions were not affected by the instructions upon the subject of manslaughter. The convictions upon the assault counts therefore will stand.

The judgment is reversed as to the murder conviction only. With respect to counts II and III the judgment is affirmed.

Jefferson, J., and Fox, J.,* concurred.

A petition for a rehearing was denied September 8, 1967, and respondent's petition for a hearing by the Supreme Court was denied October 19, 1967. Mosk, J., and Burke, J., were of the opinion that the petition should be granted.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.