[Crim. No. 14190. Second Dist., Div. Four. Sept. 26, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN H. WATERS, Defendant and Appellant.

John H. Waters, in pro. per., and Stephen Warren Solomon, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Philip M. Rosten and James H. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

JEFFERSON, J.—Defendant was tried by a jury and convicted of murder in the second degree. He appeals from the judgment.

A summary of the evidence is as follows: On November 15, 1966, defendant was drinking wine and vodka with some other men next to the railroad tracks. They were in an area used as a campground by itinerant workers and known as the Southern Pacific Jungles. At about 2:15 p.m. Officers Winniford and Sabiron talked to defendant when they came to the area to investigate the report of a disturbance. When they drove up, defendant was talking loudly and using profanity directed toward police officers. Officer Sabiron ordered him to come over. Defendant complied and sat in the police vehicle. The officers observed that defendant had been drinking. According to Winniford, it was a borderline decision whether he would be taken into custody as a drunk. However, defendant was able to walk and to answer their questions and they decided not to arrest him.

According to Williams and Allen, two companions of defendant, he had been drinking with them since early that morning, and was pretty drunk. They had about three or four half-gallons of wine and a pint of vodka. When the police arrived and talked to defendant they hid the bottles. They brought the bottles back out again when the officers left.

After the officers left defendant walked back and laid down next to Williams and Allen, who were cooking chicken in a large can. They were sitting next to the tracks and in front of a small building known as the scale house. After a short time defendant got up and went behind the scale house. There was another man behind the scale house at the time. Allen had observed the man's feet sticking out. Defendant and the man began to fight. The man was on the ground and defendant was hitting him with something he held in his hand. At this point Allen and Williams got up and walked off down the tracks.

Two railroad employees, Medrano and Valdez, were work-

ing about 500 feet from the scale house. Both saw four men behind the scale house. Two left immediately when defendant began beating the fourth. They had observed the police talking with defendant and saw him go behind the scale house after the police left. About 15 minutes later they saw defendant begin struggling with a man who was on the ground. They saw the two other men walk off when the fight started. Defendant repeatedly struck the man on the ground with something in his hand. Defendant then dragged the man over to a nearby creek and dumped him there. He then went over and sat down with the two men he was with previously. When the man defendant was fighting with did not get up after about 10 minutes had passed, Medrano and Valdez went over to investigate. The man appeared to be dead. His head was "all bashed in."

Williams and Allen saw defendant again shortly after the fight. They observed that he stopped to talk to a man in a truck a short distance away.

The man was Russell Olson. He was sweeping out the bed of his pickup truck when defendant approached him. Defendant offered to do the sweeping for a quarter. When Olson refused defendant said he would do it for a dime. Olson said he had no money with him. Defendant then turned and walked off and sat down with two other men. Defendant appeared to Olson to be drunk. However, he displayed no hostility to Olson, had no difficulty walking and appeared to know what he was doing.

When defendant rejoined Allen and Williams, he no longer was wearing his hat or coat. After sitting down he wiped some red drops which looked like blood off his shoes. The officers came a few minutes later.

About 20 minutes after talking with defendant, Officers Winniford and Allen responded to a call to return to the area. They observed the body of a man pointed out to them by the railroad workers and then found defendant sitting with Allen and Williams. He no longer had on his hat or jacket and they noted red spots on his shoes which appeared to be blood. They observed that he was still "borderline as far as sobriety" and in more or less the same state as when they had left him shortly before.

The dead man was identified as Edward Heller. An autopsy revealed that death resulted from multiple blows to the head with a "fairly heavy" object wielded with considerable force. No alcohol was found in the blood of the deceased.

Stains on defendant's shoes and trousers were analyzed and found to be human blood stains.

In his defense defendant testified that he could not recall getting into a fight that day; he did not know anybody by the name of Heller; he remembered drinking wine and vodka that morning and that he had talked to the police; he did not know what he talked to them about; he remembered that he was arrested later that day and put in a police car; he could not recall going to the station; he did not know how much he had had to drink, but recalled that he was not completely sober the next day when he talked to his attorney in jail.

Expert testimony was introduced. Dr. Forte (called by defendant) related that he had examined defendant back in 1961 to determine whether he should be institutionalized. Defendant was then a chronic alcoholic who had blackout spells from heavy drinking. In addition to Forte, Drs. Wells and Patterson testified (the latter being called in rebuttal by the prosecution). All three doctors, upon being questioned by the defense, indicated that excessive alcohol could cause unconsciousness or nonpurposeful action on the part of a person. But in response to hypothetical questions posed by the prosecution, each of the three doctors testified that, given a situation where the person performed the acts defendant was alleged to have performed both before, in the commission of, and after, the alleged homicide, that such conduct would indicate the person was conscious of what he was doing.

Two contentions are urged by defendant. Both concern the instructions given to the jury. One of the points raised may be disposed of in short order. ■ Defendant requested and was refused an instruction on proximate cause. The instruction requested (Caljic No. 312) states that, to constitute a homicide, there must be in addition to the death of a human being, an act which proximately caused that death. The instruction then goes on to define proximate cause. Defendant claims that this instruction should have been given because, from the testimony of Dr. Blanchard (the pathologist who performed the autopsy on the victim and who gave the only expert testimony relative to the cause of death), it could be inferred that death was not caused by blows on the head but by lack of proper medical care. No such inference may be raised from Dr. Blanchard's testimony. He unequivocally testified that "the cause of death was severe brain injury" occasioned by the beating the deceased received. There being

no issue as to the cause of death, the court properly refused the proffered instruction on proximate cause.

■ Defendant's second contention is meritorious. He points out that the jury was not told in the instructions given that he could be convicted of the lesser included offense of voluntary manslaughter based on the concept of diminished capacity, and urges that the failure to give such an instruction was prejudicial error.

The court instructed the jury concerning what constitutes murder both first and second degree and explained there was a lesser included offense of which defendant could be found guilty, namely manslaughter. As to the latter, the jury was instructed: ''Manslaughter is the unlawful killing of a human being, without malice aforethought. It is not divided into degrees but is of two kinds, namely, voluntary manslaughter and involuntary manslaughter.

The court then gave the following definition of voluntary manslaughter: ''Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought upon a sudden quarrel or heat of passion without deliberation or premeditation.''

The jury was further instructed:

''Manslaughter is distinguishable from murder principally in this: That though in manslaughter the act which occasions the death be unlawful or likely to be attended with bodily mischief, yet the malice, either express or implied, which is an essential element of murder, is wanting, and the act being imputed to the infirmity of human nature, the correction ordained for it is proportionately lenient.

''When the mortal blow, though unlawful is struck in the heat of passion or is excited by a sudden quarrel such as amounts to adequate provocation, the law, out of forbearance for the weakness of human nature, will disregard the actual intent, and will reduce the offense to manslaughter. In such a case, even if an intent to kill exists, the law deems that malice, which is an essential element of murder, is absent.''

Then followed this instruction:

''If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defend-

ant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree.''

It is to be observed that the court gave the definition of voluntary manslaughter found in Penal Code section 192, *i.e.,* an unlawful killing of a human being without malice ''upon a sudden quarrel or heat of passion.'' The court then further explained how manslaughter is distinguished from murder, using this definition. An instruction was given that if the defendant's mental capacity was so diminished by intoxication or other cause that he could not either premeditate or form an intent to kill, or harbor malice aforethought, that he could not be found guilty of murder either of the first or second degree. However, nothing was said about the fact that voluntary manslaughter may be found to exist where the defendant did not attain the mental state constituting malice, because of a diminished capacity caused by mental illness, mental defect, or intoxication. (*People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].)

Out of the doctrine of diminished capacity there has been developed a type of voluntary manslaughter which does not come within the definition of that crime found in Penal Code section 192. (*People* v. *Conley, supra; People* v. *Aubrey,* 253 Cal.App.2d 912, 919 [61 Cal.Rptr. 772].) As this court said in *Aubrey,* (at p. 919): ''To explain manslaughter in terms of its statutory elements, as set forth in section 192, does not reveal to the jury the existence of the nonstatutory form of the offense. The statutory definition carries the implication that only a homicide provoked by passion or a sudden quarrel can be classified as voluntary manslaughter.''

The Attorney General concedes that, in the light of these decisions, the trial court's omission was error, but maintains that it was not prejudicial to defendant.

The evidence establishes that defendant was to some extent intoxicated at the time the crime occurred. He attempted to establish the defense of unconsciousness.[1] While the evidence

---

[1] In connection with this issue, the court incorrectly instructed the jury that unconsciousness was a complete defense. If caused by voluntary

indicates defendant was not so intoxicated that he was unaware of what he was doing, it does present circumstances which would clearly support a finding "that due to diminished capacity caused by . . . intoxication, the defendant did not attain the mental state constituting malice." (*People* v. *Conley, supra,* at p. 325 fn. 4; *People* v. *Aubrey, supra,* at p. 919.) Under the cirumstances presented, we conclude that the error was prejudicial in that it denied defendant the right to have this important issue presented to the jury.

 The Attorney General suggests that the nonstatutory type of manslaughter talked about in *Conley* and *Aubrey* must be premeditated and the result of deliberation "because of the conceptual character of nonstatutory manslaughter, which is little more than first degree murder without malice." On such premise it is argued that since the jury found defendant guilty of only second degree murder, it necessarily rejected premeditation and deliberation in this case.

The premise for this argument is faulty. The decisions in *Conley* and *Aubrey* both involved first degree murder convictions; both decisions held that a person whose capacity to harbor malice is impaired, *may be* guilty of voluntary manslaughter, even though the killing was premeditated. The decisions did not say that where the killing is shown to be unpremeditated, the concept of diminished capacity cannot be applied to find a defendant guilty of voluntary manslaughter. No reasonable basis exists for such a conclusion.

The judgment of conviction is reversed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied October 4, 1968, and respondent's petition for a hearing by the Supreme Court was denied November 20, 1968. Mosk, J., was of the opinion that the petition should be granted.

---

intoxication, it is not a defense when the crime requires only a general criminal intent (as does manslaughter). (*People* v. *Conley, supra,* 64 Cal.2d 310, 323-324.)