[Crim. No. 3341. Fourth Dist., Div. Two. Mar. 20, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. NORVALL ELMA AUSTIN, Defendant and Appellant.

---

Richard J. Weller, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Mark L. Christiansen, Deputy Attorney General, for Plaintiff and Respondent.

GABBERT, J. pro tem.*—An information was filed charging the defendant with the murder of Frederick Ives Lord. Defendant entered a plea of not guilty. The jury found him guilty of murder in the second degree. A motion for new trial was denied, probation was denied and defendant was sentenced to state prison for the term prescribed by law. This appeal followed.

The defendant's contentions on appeal are numerous. However, a reversal is required on a controlling issue. We find that the defendant presented sufficient evidence of diminished capacity to require the trial court to instruct the jury that it could convict defendant of voluntary manslaughter if it found that the defendant had intentionally taken life but in so doing lacked malice because of diminished capacity due to mental defect, mental illness or intoxication. This ruling necessarily follows because of the factual circumstances and the applicable law set forth in the recent case of *People* v. *Castillo,* 70 Cal.2d 264 [74 Cal.Rptr. 385, 449 P.2d 449], and *People* v. *Conley,* 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].

The Attorney General, with commendable fairness, after oral argument on this appeal, and after further review of the record herein, has informed this court that the *Castillo* case is applicable to the determination of this appeal.

---

*Assigned by the Chairman of the Judicial Council.

The application of the defense of diminished capacity requires that we set forth the facts in considerable detail.

Frederick Ives Lord was approximately 70 years old, had emphysema, angina pectoris, and high blood pressure. His left arm had been badly injured and he could not raise it above the shoulder. On July 21, 1967, about 12:30 p.m., he left his desert home in his 1961 Tempest automobile to go to Apple Valley to meet a real estate agent. His wife asked him to stop at the store for some milk. At 1 p.m., Mr. Lord arrived at the real estate office and the agent presented him with two bottles of Seagram's whiskey as an expression of gratitude for a tip on the sale of some real property. He left the office at about 1:15 p.m., wearing brown pants, a brown shirt and a bolo tie.

At approximately 7:45 p.m. on July 21, Mr. William Bloomquist observed the defendant Austin in a 1950 Chevrolet on Red Wing Road traveling toward Apple Valley. The two men stopped and talked for two to three minutes. Defendant did not appear to be intoxicated. Following the conversation, defendant continued toward Apple Valley. Somewhat later, Mr. Jordan Howe was traveling south on Red Wing Road toward Apple Valley when defendant passed him sounding his horn continuously. Howell estimated defendant's speed at 50 miles per hour.

About 8:30 p.m. that evening, Kenneth Hillman, a member of the air force, was driving along a road on the outskirts of Victorville when he observed an older model Chevrolet swerve across the highway, careen over an embankment and roll over. Hillman went to the vehicle which had landed right side up and found defendant "half-lying and half-sitting in the front seat." Defendant appeared to be intoxicated and Hillman noticed a rifle, a bumper jack and a hat lying on the ground. When asked if he needed assistance, defendant began using profanity, left the car and threw the items on the ground into the back seat. Hillman obtained flares from his car, set them out along the road and contacted the Victorville police. When he returned to the scene of the accident, he found defendant's car running but stuck in the sand. Defendant then left his car, staggered up the embankment, crossed the highway and fell under a tree.

When officers arrived they found defendant lying under the tree. He appeared to have passed out. Defendant was placed under arrest for public drunkenness. He was groggy, very aggressive and told the arresting officer that he was required

to give only his "name, rank and serial number." Despite his profanity and resistance, defendant was handcuffed and placed in a patrol car. The officer observed that defendant was wearing only a pair of grey trousers and that he had a surface abrasion on one foot and a small cut under his ear but the bleeding had stopped and a scab had formed. An investigation of the accident scene revealed a loaded rifle, a mismatched pair of shoes, and some small pieces of paper.

On July 22, 1967, at approximately 10:30 a.m., Mr. Stephen Burke, a close friend of Mr. and Mrs. Lord, received a telephone call from Mrs. Lord. She told him that her husband had not returned home the night before and asked him to investigate. One of Mr. Burke's neighbors stated that he had seen Mr. Lord's car parked in front of defendant's residence. Mr. Burke arrived at defendant's home at approximately 11:20 a.m. and observed Mr. Lord's vehicle parked outside. The front door of the house was open but the screen door was closed. Upon entering he discovered Mr. Lord's unclothed body lying on the floor with the head about 18 inches from the door, feet lying straight out and one arm half-cocked. Sheriff's deputies arrived at approximately 2:30 p.m. in response to Mr. Burke's telephone call.

Defendant's house consisted of but one room. Inside, officers found: Mr. Lord's string tie and cigarette holder on a round table; an electric coffee pot stained with human blood, type "A"; Mr. Lord's trousers with the undershorts still clinging to the legs and with cuts on the trouser legs corresponding to cuts on the legs of the decedent; glass fragments stained with human blood; a second pair of brown trousers containing several items identified by Mrs. Lord including a two-bladed knife, a large paper clip, one dollar, some small coins, and a small piece of paper listing Mrs. Lord's clothing sizes; a bloodstained screwdriver; a wash basin containing Mr. Lord's shirt which was stained with human blood, type "A"; a water cooler with hair similar in character to the decedent's mixed with blood and amber glass fragments on top; a pair of blue work pants containing Mr. Lord's bloodstained wallet; a mismatched pair of shoes which apparently were the mates of the shoes found at the scene of the accident; spots and smears of blood on the floor; and, wooden parts of a chair which matched parts found outside the cabin and which were stained with human blood.

In the area immediately adjacent to the cabin investigation discovered: scuffle marks on the ground near Mr. Lord's car;

a container of milk on the rear seat of the car, blood stains, type "A," on the front seat; and marks near the front of the residence which indicated to officers that a car had turned around and accelerated away from the area at a high rate of speed.

Inside the shoes found at the accident scene the officers discovered a portion of a Seagram's bottle label. It was compared with two fragments found at defendant's cabin and an expert concluded that the fragments were once attached together.

Undershorts of defendant taken from him at the time of arrest were examined and found to contain spots and smears of human blood, type "A." Blood stains were also discovered on some money found in defendant's possession. A sample of defendant's blood was taken and it was determined to be type "O." Type "O" blood is found in 45 percent of the population. Forty percent of the population has type "A" blood.

Mr. Lord's urine was examined for its alcohol content and it was determined to contain a level of 0.15 percent which correspondends to 0.111 percent blood alcohol level. A mixed blood and gastric fluid sample was secured by slipping a bottle into the chest cavity of the decedent during the autopsy which showed a 0.40 percent alcohol level. However, the sample was of questionable value as an index of blood alcohol content because it was contaminated by a high percentage of gastric material. A prosecution expert testified that: a man who is described as falling down, muttering to himself incoherently and generally staggering and weaving about would be expected to have a blood alcohol level of 0.20 percent; complete muscular uncoordination occurs at 0.25 percent; and death would occur at levels of approximately 0.40 percent-0.50 percent.

The autopsy of the body of Mr. Lord was performed by Dr. Harry Wayne Scott, a specialist in pathology. His testimony may be summarized as follows: the decedent has been dead a number of hours; rigor mortis had come and gone and the body was completely flaccid; rigor mortis was well established and indicated that decedent had been lying on his back after death; the body showed evidence of extensive bruising due to multiple blows with a blunt instrument about the face and front of the upper chest; there was a swelling of the face and upper chest due to a collection of fluid in the tissue under the chin. A stab wound appeared under the edge of the left jaw, extending along the edge of the bone to a depth of approxi-

mately 2 inches. Small abrasions were found on the legs. The blows which caused the bruising were struck with a blunt object such as a fist and were struck with considerable force. The stab wound could have been caused by an ice pick, narrow-bladed knife or the screwdriver found in the cabin. Death occurred sometime between 30 minutes to 2 to 3 hours after infliction of the bruising. A large external bruise was discovered in the back of the head; it was caused by a fall with considerable force; the injury could have been caused by the decedent simply toppling over, falling spontaneously or being pushed down; the fall caused a hemorrhage to the frontal tips of the brain. The head injury occurred a few minutes after the bruises to the face and the chest and it resulted in almost immediate unconsciousness. The deceased had a large amount of liquid in his stomach and a volume of this liquid flowed from the stomach into the lungs. The decedent was unable to cough up this liquid due to his unconscious state and as a result he drowned in the stomach fluid which entered the lungs. A volume of blood was found in the gastric contents; this was primarily due to acute gastritis, an inflammation of the stomach lining caused by a large intake of alcohol which led to an oozing of blood from the inner lining of the stomach into the gastric contents. There was no evidence that the decedent had any kind of heart attack or coronary. The possible time period of death was estimated as between 6:30 a.m., July 21, and 8:30 a.m., July 22.

The testimony in defense may be summarized as follows:

Dr. George M. Thompson, a specialist in neurology, psychology and electroencephalography, testified that: he performed electroencephalographic tests on defendant. First, a standard encephalogram was conducted; next an "alcohol activated" examination was performed; this test consisted of defendant drinking two ounces of 80 proof alcohol and then being examined 15 minutes later; during the third of such tests the doctor detected "spiking" on the recorded tracings of defendant's brain waves; "spiking" does not occur in a normal brain pattern. As a result of the clear "spiking" pattern, Dr. Thompson concluded that the defendant was abnormally sensitive and susceptible to the effects of alcohol in relatively small doses. It was the doctor's opinion that the abnormality, indicating brain scar tissue, was probably "moderately severe" on a scale of "slight to very severe." Because of such possible brain change a small amount of alcohol taken on an empty stomach could set off an attack of

psychomotor epilepsy which would cause a loss of memory and very likely assaultive behavior. If such an attack had occurred, defendant might still have amnesia or might simply show a greater degree of confusion and muddled thinking than an average person who had consumed the same amount of alcohol. Dr. Thompson thought that it was unlikely that defendant suffered from acute pathological alcoholic intoxication.

Dr. Thompson testified that psychomotor epilepsy precipitated by alcohol becomes known under the term acute pathological alcoholic intoxication. Such is a condition in which a person has brain abnormality due to brain injury, scar tissue on the brain or some other brain damage. The doctor stated that sometimes a person who is abnormally susceptible to small amounts of alcohol may have a psychomotor seizure and attack precipitated by alcohol. At such times the person may walk around and carry out formulated behavior but he may have a loss of memory, either total or partial, for the time period of the attack, and often carries out abnormal behavior, frequently assaultive in nature.

Dr. Guy M. Hunt, a neurologist, testified that: as a result of his examination of defendant, including a review of Dr. Thompson's electroencephalogram, several letters and defendant's medical history, he formed the opinion that defendant suffered from a chronic adult maladjustment syndrome with paranoid trends. In a conversation with defendant at the San Bernardino County jail, the defendant told him that he remembered a ''friend'' coming to visit him on July 21, that the ''friend'' brought two bottles of whiskey, that they began drinking and had almost finished the first bottle, that he could not remember anything from that time until he was placed in custody and that he did not remember the accident. Dr. Hunt stated this is consistent with a conclusion of amnesia and brain damage. Because of his impairment defendant would not be able to deliberate and weigh the consequences of his acts. Under the influence of alcohol defendant would not be able to harbor malice as that term is used to indicate a desire to vex or to hurt someone. If defendant had been drinking, a remark, which under normal circumstances would not affect him at all, might suddenly cause him to become violent. Also, a plan of action which defendant might have when sober would not be carried over into a period of intoxication. When intoxicated the defendant would be malicious in the sense that he would become unreasonable, combative and easily irritated.

Dr. Howard Bachrach, a physician specializing in internal medicine, first examined the decedent on November 15, 1965, and diagnosed his condition as hypertension and emphysema. In August 1966, Mr. Lord complained of chest pains and the doctor took an electrocardiogram which when compared with the electrocardiogram taken the previous November indicated myocardia eischemia, a lack of blood supply to the heart muscle. He formed the opinion that decedent had arteriosclerotic heart disease with a coronary insufficiency and that under conditions of stress he would be susceptible to an acute coronary occlusion.

Finally, Dr. Rene Modglin, a pathologist, testified that he examined the sample of gastric contents taken from the deceased; it indicated that Mr. Lord had approximately one pint of blood in his stomach and that such a quantity of blood in the stomach would not be the result of acute gastritis but could be due to ulceration or rupture of a varicose vein in the esophagus. In rebuttal, Dr. Scott testified that he examined the body for ulcers and for a ruptured varicose vein but found none. The absence of another source led him to conclude that the volume of blood in the gastric contents was due to acute gastritis.

In brief, defendant's contentions on appeal are: (1) Insufficiency of the evidence to support the conviction; (2) error in the instructions; and, (3) error in the denial of his challenge to the jury panel.

As the facts show this case presents a question on the issue of sufficiency of the evidence to establish: (1) that a crime has been committed; and, (2) that defendant committed it.

However, a reversal of the judgment is required for the reason that the trial court erred in not qualifying the general instructions on the effect of defendant's voluntary intoxication by giving the instruction set forth in *People* v. *Conley, supra,* 64 Cal.2d 310, 324-325, fn. 4. The need for a voluntary manslaughter instruction in cases involving the question of diminished capacity has recently been clarified in *People* v. *Castillo, supra,* 70 Cal.2d 264.

In *Castillo,* the court comments that an instruction under which the jury might conclude that the defendant's mental capacity was so diminished that he did not harbor malice aforethought, so that it *could not* find him guilty of either first or second degree murder, standing alone, is insufficient. The jury must also be advised that it *could* convict defendant of voluntary manslaughter if it found that defendant had

intentionally taken life but in so doing lacked malice because of diminished capacity. Quoting from *People* v. *Aubrey,* 253 Cal.App.2d 912, 918-919 [61 Cal.Rptr. 772], the court in *Castillo* observed that there is a type of voluntary manslaughter which does not fall within any of the three definitions found in Penal Code, section 192. ▮▮▮ This nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated and unprovoked. It is distinguished from murder in that the element of malice has been rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication. In *People* v. *Conley, supra,* 64 Cal.2d 310, 318, the court held that since the voluntary manslaughter statute was enacted before the concept of diminished capacity had been developed, its enumeration of nonmalicious criminal homicides did not include those in which the lack of malice resulted from diminished capacity. The statute's enumeration would not be exclusive, moreover, for in the absence of malice a homicide would not be an offense higher than manslaughter.

▮▮▮ The question as to whether there was lack of malice because of diminished capacity was deserving of consideration. (*People* v. *Castillo, supra,* 70 Cal.2d 264; *People* v. *Modesto,* 59 Cal.2d 722, 727 [31 Cal.Rptr. 225, 382 P.2d 33].) The court did give instructions on diminished capacity in other respects in this case. However, it did not instruct the jury on nonstatutory voluntary manslaughter. The jury should be instructed on every material question upon which there is any evidence deserving of any consideration whatever. (*People* v. *Castillo, supra,* 70 Cal.2d 264; *People* v. *Modesto, supra,* 59 Cal.2d 722, 727; *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281].)

In *People* v. *Modesto, supra,* at p. 731, it is stated: "It is . . . settled that defendant's right to a manslaughter instruction when there is evidence thereof precludes not only our weighing that evidence to determine the likelihood that a properly instructed jury would have found manslaughter, but also our attempting to determine how the failure to present the issue of manslaughter to the jury may or may not have influenced its choice between first and second degree murder. Since we do not know what effect an instruction that the jury could return a verdict of manslaughter would have had on its deliberations, we cannot conclude that it necessarily rejected the evidence of manslaughter. Defendant was entitled to a

jury trial on all of the issues presented by the evidence, and that right he was denied.''

The *Castillo* case has now established that a similar rule applies when the jury is not instructed that it can return a verdict of voluntary manslaughter due to diminished capacity. (*People* v. *Castillo, supra,* 70 Cal.2d 264, 271; see also *People* v. *Waters,* 266 Cal.App.2d 116, 121-122 [71 Cal.Rptr. 863]; *People* v. *Aubrey, supra,* 253 Cal.App.2d 912, 919-920.) ▪ Nor does the failure on the part of the defendant to request such particular instruction preclude the defendant from raising the point on appeal. (See cases cited in footnote to *People* v. *Castillo, supra,* at p. 271.)

In this case there was sufficient evidence present on the issue of diminished capacity to require that the instruction be given on the court's own motion. Under the decisions cited herein it has been repeatedly stated that the appellate court will not attempt to assess the prejudicial effect of this error. (*People* v. *Castillo, supra,* 70 Cal.2d 264, 271.)

Defendant's other assertions of error are unlikely to arise upon a retrial.

The judgment of conviction is reversed.

McCabe, P. J., and Tamura, J., concurred.