[Crim. No. 3403. Fourth Dist., Div. Two. June 30, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DIONISIO RODRIGUEZ, Defendant and Appellant.

Edward P. Foley, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

GARDNER, J. pro tem.*—The defendant was charged with one count of murder and two counts of assault with a deadly weapon. One count of assault with a deadly weapon was dismissed prior to trial. At trial the jury found the defendant not guilty of the other count of assault with a deadly weapon, but guilty of murder in the second degree. His motion for a new trial was denied. He was sentenced to prison. He appeals from the judgment of conviction.

On November 15, 1967, the decedent, Lester Nye, his brothers, Joseph Nye and Johnny Nye, and two friends were in a bar called the "Pit Stop A-Go Go" at about 11 p.m. When they left, Joseph Nye saw the defendant in front of the bar brandishing a knife at Mark Lavinsky, a 16-year-old boy. The defendant waved his knife in front of Mark's face with a slashing motion and asked him if he liked it. The defendant was described as being of Mexican descent with a goatee and an earring. Eight or nine other people of Mexican descent were with the defendant. Joseph Nye approached the defendant and said of Mark, "Leave him alone. He's a kid, don't." The defendant thereupon turned on Joseph Nye, brandishing the knife in a slashing motion toward his neck, jaw and face, and hollered, "You like it? You want some of it, too? You like it?" Whereupon, Joseph knocked the defendant down with a right-hand blow to the left side of the defendant's face. At the same time, defendant's other companions closed in on Joseph. Three or four knives were seen drawn by them. Joseph was backed up and cut on the arm.

The bartender in the Pit Stop heard an argument, went outside and told the participants to "Knock it off," and returned to the bar. Soon thereafter a barmaid told him there was a fight going on outside. He went out with a pistol and saw a group of persons of Mexican descent fighting other persons who did not appear to be of Mexican descent. He saw two men fighting in one area and then saw the defendant run over to that area with what appeared to be a knife in his hand. He saw the defendant make a motion, "like this," to the front of one of the two men engaged in the fight. Then he saw the defendant back off while the person at whom the motions with the knife-like object had been made ran off. His front was covered with blood, and his hands were across his stomach. A moment later, Joseph saw his brother, Lester, the decedent, holding his stomach while part of his intestinal wall

---

*Assigned by the Chairman of the Judicial Council.

hung out of an incision. Lester was taken to the hospital where he died as a result of the wound.

Officers were called, and the defendant was observed to be walking a half-mile away from the bar by a deputy sheriff. He had reversed his jacket so that he was wearing it inside out. [Defendant was a member of the Royal Angels Club, and was wearing a Royal Angels' jacket that night which had a distinctive insignia on its back.] The defendant had a black eye, wore a goatee and an earring. He told the deputy he had been jumped and beaten up by two ''winos'' at a park. Later, he told another officer that someone had thrown him a knife but that he immediately threw it to someone else.

On November 17 defendant participated in a lineup. Prior to the lineup, the bartender was shown several photographs and identified the defendant as a person involved in the fight. Joseph and Johnny Nye were both shown photographs and both identified Henry Arroyo and Joseph Ceballos as being involved in the fight, but they did not identify the picture of the defendant.

Defendant was advised of his right to have an attorney present at the lineup, which right he waived. He was then shown in a lineup with three other persons to Joseph Nye, Johnny Nye and the bartender, each separately. All four persons in the lineup were of Mexican descent, all were in their late teens and early 20's [defendant was 28], all were approximately the same height, all wore orange suits. The defendant in the meantime had shaved off his goatee and was not wearing his earring at the time of the lineup, but two of the particpants in the lineup were wearing goatees. Joseph Nye, Johnny Nye, and the bartender all separately identified the defendant in the lineup.

At the trial, a criminalist was called by the defendant and testified that he had taken a blood sample of the defendant, and that the defendant had a .20 blood-alcohol content; that for a man of defendant's size, it would take 20-25 ounces of 86-proof liquor to reach that level. The criminalist testified that his work was limited to relating blood-alcohol to the ability to operate a motor vehicle, and that at .20, in his opinion, it was unsafe to drive. The criminalist also stated that a person with this blood-alcohol content would be unable to make decisions or react as quickly as in a normal situation and possibly would be disoriented as to time or place. He also testified that this blood-alcohol content was slightly lower than that of the average person arrested for driving under the influence of alcohol.

As part of the defense, a deputy sheriff testified as to some uncertainty on the part of witnesses in identifying pictures of the defendant and others of his group, together with discrepancies in their identification of the defendant.

Joseph Ceballos, a witness for the defendant, testified that he was with the defendant on the night of the fight; that they drank some beer at a friend's house, went to a bar, drank some more beer, then went to the Pit Stop; that he saw the defendant vomiting next to their car; that he went to the restroom, and when he came out, he was knocked out by a tire iron and woke up in the hospital.

The defendant testified that on the afternoon of the fight he had been to a friend's house drinking beer; he had been to a meeting of his club, the Royal Angels; that on that evening, he had been in two bars drinking "a lot" of beer; that he remembered drinking four pitchers of beer plus "some other beer"; that he went to the Pit Stop with a group which included Henry Arroyo, immediately became sick, vomited, someone hit him in the eye, and he ran away because of fear of Arroyo. Defendant testified that Arroyo belonged to another club, the Vagos, and he feared that Arroyo had turned upon him. He admitted that he had a goatee and earring the night of the fight; he denied hitting or stabbing anyone or threatening anyone with a knife. He testified that Arroyo was similar in appearance to him, inasmuch as Arroyo also had a goatee and earring.

Appellant contends:

1. *The in-court identification of the defendant was the result of a tainted lineup.*

■ The lineup was fair—remarkably so. Defendant was advised of his right to an attorney and waived that right, so can only allege unfairness under *People* v. *Caruso,* 68 Cal.2d 183 [65 Cal.Rptr. 336, 436 P.2d 336]. All the participants were of Mexican descent. They were all approximately of the same size, age and appearance. They were all wearing the same clothes. The witnesses were separated at the time of the lineup. The peculiar thing is that at the time of the murder, defendant was wearing a goatee and earring, but at the time of the lineup, he had neither. Nevertheless, the officers placed two people in the lineup who were wearing goatees. In spite of this, all three witnesses identified the defendant.

■ The defendant's principal ground of complaint is that he was the only one in the lineup with a black eye. The

black eye may have been of importance to the Nye brothers, but the bartender never saw Joseph Nye strike the defendant, so a black eye would be of no significance to him. But, if the black eye is significant, one wonders where the police are going to find three other Mexicans of similar size, age and appearance with black eyes. Waiting for such individuals to appear might delay a lineup and the resulting prosecution almost indefinitely. Furnishing such individuals with black eyes would be, to put it mildly, unpleasant for the unfortunate person so selected. It is doubtful that the law asks for such a sacrifice in the interest of justice. Waiting for the defendant's black eye to go away would result in the defendant being held in custody on a nonbailable offense when a lineup might well clear him of the charge and send him on his way to nurse his black eye under more hospitable conditions. The lineup was as fair as could reasonably be expected under the conditions.

2. *The instruction on conspiracy should not have been given since there was no evidence supporting a conspiracy.*

 The case was tried on the theory, and the only evidence was, that the defendant, not anyone else, killed Lester Nye. The instruction on conspiracy should not have been given. It was, at best, surplusage and not responsive to any evidence. While it was probably not reversible error to give this instruction, since the case must be reversed on another ground, this instruction should not be given on retrial.

3. *An instruction on involuntary manslaughter should have been given since diminished capacity was in issue.*

The court instructed on murder and statutory voluntary manslaughter. Appellant contends the court should have instructed the jury, even though it was not requested to do so by the defendant, on involuntary manslaughter, in regard to diminished capacity, because the defense introduced evidence showing the defendant had been drinking that night. The Attorney General, with commendable candor, suggests that the argument should be broadened in the light of *People* v. *Castillo*, 70 Cal.2d 264 [74 Cal.Rptr. 385, 449 P.2d 449], to ascertain whether or not instructions should have been given on *nonstatutory* manslaughter as defined in *People* v. *Conley,* 64 Cal.2d 310, 324-325 [49 Cal.Rptr. 815, 411 P.2d 911]. The court only gave the abridged version of the *Conley* instruction concerning diminished capacity, which omitted the *nonstat-*

494

*utory* manslaughter definitions, and was criticized in *Castillo* for its inadequacy.

■ This case points up vividly the problems of the trial, judge in applying the ever-expanding law of *sua sponte* instructions, and amplifies the warning of Justice Friedman in the case of *People* v. *Chapman,* 261 Cal.App.2d 149, at p. 174 [67 Cal.Rptr. 601], in which he said: "In *People* v. *Crawford* (1968) 259 Cal.App.2d 874 [66 Cal.Rptr. 527], we observed that overbroad appellate demands for *sua sponte* instructions tend to hamper the tactical choices of defense attorneys and put trial judges under pressure to glean legal theories and winnow the evidence for remotely tenable and sophistical instructions. They also supply defense counsel an opportunity to capitalize on invited error by failing to request an instruction thinly supported by meager evidence, then utilizing its absence as an argument for appellate reversal."[1]

Nevertheless, it was the duty of the court to instruct on all material issues presented by the evidence. This brings us to the troublesome problem of the quantum of evidence to require *sua sponte* instructions.

■ As to *requested* instructions, the established rule as to the requisite amount of evidence requiring the giving of an instruction is stated in *People* v. *Carmen,* 36 Cal.2d 768, 773 [228 P.2d 281], as follows: "It is *elementary* that the court should instruct the jury upon every material question upon which there is *any evidence deserving of any consideration whatever.*" (See *People* v. *Modesto,* 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33].)

■ As to *sua sponte* instructions, the rule has been stated to be: "In criminal cases the court has the duty of giving on its own motion instructions on the *pertinent general principles of law* where they are not proposed by the parties. There is no duty, however, to give instructions upon specific points developed through the evidence introduced at trial unless

[1]On April 12, 1969, the Honorable Philip H. Richards, Judge of the Superior Court of Los Angeles County, retired, and consultant for the CALJIC and BAJI Committee of the Los Angeles County Superior Court, delivered a paper to the Superior Court Workshop sponsored by the Conference of California Judges on the subject of *sua sponte* instructions. After pointing out the necessity of instructing *sua sponte* on general principles of law governing the case, such as those which delineate the elements of the offense charged, and included offenses, Judge Richards presented a miscellaneous list of *sua sponte* instructions which was not intended to be exhaustive but merely a ready check list for the busy trial judge. This list contained approximately 114 situations in which the appellate courts have indicated that the giving of certain instructions was mandatory.

such instructions are requested by a party or are necessary for the jury to be fully and fairly charged upon the relevant law.'' [Italics added.] (*People* v. *Jackson,* 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937].)

The case of *People* v. *Wade,* 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116], commenting on the phrase, ''general principles of law governing the case,'' states: ''The most rational interpretation of the phrase 'general principles of law governing the case' would seem to be as those principles of law commonly or closely and openly connected with the facts of the case before the court.''

█ While the duty requires percipience, it does not require omniscience. The limitation on the court's duty has been set forth in *People*.v. *Wade, supra,* 53 Cal.2d 322, 334, as follows: ''. . . In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested . . .

''The rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defend-. ants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. *The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.* [Italics added.]

''The most rational interpretation of the phrase 'general principles of law governing the case' would seem to be as those principles of law commonly or closely and openly connected with the facts of the case before the court.''

Thus, in cases involving intoxication where the contention is made that, by reason of the intoxication, the issue of diminished capacity is presented, *sua sponte* instructions on intoxication and diminished capacity have been excused if evidence of defendant's intoxication was ''fragmentary'' (*People* v. *Fain,* 70 Cal.2d 588, 596 [75 Cal.Rptr. 633, 451 P.2d 65]); ''minimal, sketchy, speculative'' (*People* v. *Crawford, supra,* 259 Cal.App.2d 874, 878); or ''only distantly, if at all, suggested by the evidence'' (*People* v. *Chapman, supra,* 261 Cal.App.2d 149, 174.)

■ Here, we must hold that there clearly was sufficient evidence of intoxication to call for the giving of the *Conley* instruction. The defendant's testimony that he drank in excess of four pitchers of beer, plus the criminalist's testimony that his blood-alcohol content was such that he would have had to consume an amount comparable to a pint and one-half of hard liquor to reach that blood-alcohol content, plus that witness' opinion that a person with the defendant's blood-alcohol content would be unable to make decisions or react as quickly as in a normal situation and possibly would be disoriented as to time and place is substantial evidence of intoxication and deserving of consideration. (See *People* v. *Waters,* 266 Cal.App.2d 116, 121 [71 Cal.Rptr. 863], where it was found to be reversible error not to give the *Conley* instruction where "the evidence establishes that defendant was *to some extent intoxicated* at the time the crime occurred.") [Italics added.]

The trial court *did* give an instruction on the significance of diminished capacity in reducing first degree murder to second degree murder and murder to voluntary statutory manslaughter. Thus, as the court said in *Castillo, supra,* 70 Cal.2d 264, at page 270: "Indeed, the trial court instructed on the significance of the diminished capacity defense in other respects. The court must have concluded that sufficient evidence had been introduced to compel an instruction on diminished capacity because it gave such an instruction, although it was an inadequate one. Accordingly, in failing to instruct on nonstatutory voluntary manslaughter, the court erred." Under *Castillo, supra,* this error was found to be reversible. So also, under the facts of this case, we must find the error to be reversible. (See *People* v. *Aubrey,* 253 Cal. App.2d 912, 917-920 [61 Cal.Rptr. 772]; *People* v. *Austin,* 270 Cal.App.2d 845 [76 Cal.Rptr. 154].)

As a matter of interest to all trial judges, some mention should be made of a seeming blurring of standards between the *requested* instruction situation and the *sua sponte* instruction situation.

In *People* v. *Castillo, supra,* 70 Cal.2d 264, and *People* v. *Henderson,* 60 Cal.2d 482, 490 [35 Cal.Rptr. 77, 386 P.2d 677], the Supreme Court applied the *Carmen,* i.e., *any evidence,* standard to *sua sponte* situations even though in each case the court pointed out that there was *subtantial* evidence demanding the *sua sponte* instruction.

■ The warning to all trial judges is clear. If there is

*any* evidence of intoxication, discretion would indicate that full instructions on diminished capacity and the effect of intoxication upon specific intent should be given *sua sponte*. This is obviously true if the Supreme Court is applying the *Carmen*—*"any evidence"* rule—to the *sua sponte* situation. Even if it is not, and the true rule is the *Wade* rule, that the court need not fill in every time a litigant or his counsel fails to discover *an abstruse but possible theory of the facts,* it would appear advisable to so instruct if there is *any* evidence of intoxication, rather than asking the appellate court to excuse the giving of such an instruction on the ground that the evidence of intoxication is fragmentary, minimal, sketchy or speculative.

Although directed to requested instructions, the warning of *People* v. *Wilson,* 66 Cal.2d 749 at p. 763 [59 Cal.Rptr. 156, 427 P.2d 820], may well be in order: ██ "Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused."

██ The Attorney General attempts to excuse the failure to give the instruction on diminished capacity on the theory that since the defendant denied the killing, the instruction was unnecessary. Unfortunately, the facts of the cases he cites do not support his position.

It is true that in the case of *People* v. *Fain, supra,* 70 Cal.2d 588, there is language to the effect that the nature of the defense would excuse a specific instruction. Nevertheless, in that case, in discussing the failure to instruct on diminished capacity, the court having pointed out that the evidence on intoxication was "fragmentary," said: "Defendant contends that the trial court should have given a manslaughter instruction on its own motion. He relies on *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]. In *Conley,* despite *substantial* evidence of intoxication, the trial court declined to give a manslaughter instruction, necessitating reversal by this court. By contrast, the evidence here did not justify a manslaughter instruction. Trial counsel did not request such an instruction, and the *minimal* evidence of intoxication was plainly insufficient to impose on the trial court a duty to give, *sua sponte,* a manslaughter instruction." [Italics added.]

In view of the record in this case, we cannot say that the evidence of intoxication was minimal. Rather, the evidence of intoxication was substantial.

Another case relied on by the Attorney General is *People* v.

*Haney,* 249 Cal.App.2d 810, 819 [58 Cal.Rptr. 36], in which the court stated it was permissible not to give the instruction on manslaughter where the defendant denied having any and all connection with the crime. However, in the *Haney* case, the defendant introduced no evidence of diminished capacity, and the court held that there was no evidence upon which the court could justify a manslaughter instruction.

The third case relied on by the Attorney General is *People* v. *Long,* 263 Cal.App.2d 540, 545-546 [69 Cal.Rptr. 698] where the court held that since the defense was not predicated upon alleged diminished capacity but on an alibi, it was not error to omit such an instruction. However, in the *Long* case, the only evidence of defendant's intoxication was the defendant's testimony on the issue of whether a statement to the officer was admissible in evidence. Therefore, intoxication and diminished capacity were never before the jury in the *Long* case.

Thus, the three cases relied on by the Attorney General are distinguishable since in those cases there was no substantial evidence of intoxication.

A case directly in point is *People* v. *Stewart,* 267 Cal.App. 2d 366 [73 Cal.Rptr. 484], in which there was substantial evidence of drinking, no request for an instruction on diminished capacity, with the defendant denying committing the offense at all. In *Stewart,* the court held that the evidence of defendant's intoxication put his intent in issue, and that it was error for the court not to give *sua sponte* a proper instruction on the subject even though he denied the killing.

Judgment reversed.

Kerrigan, Acting P. J., and Tamura, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 24, 1969.